NO. COA13-586

NORTH CAROLINA COURT OF APPEALS

Filed: 1 April 2014

STATE OF NORTH CAROLINA

   v.

JASON LYNN YOUNG

Wake County
No. 09 CRS 19207

Appeal by Defendant from judgment entered 5 March 2012 by Judge Donald W. Stephens in Wake County Superior Court. Heard in the Court of Appeals 12 December 2013.

> *Attorney General Roy Cooper, by Special Deputy Attorney General Robert C. Montgomery, Assistant Attorney General Amy Kunstling Irene, and Assistant Attorney General Daniel P. O'Brien, for the State.*

> *Appellate Defender Staples S. Hughes, by Assistant Appellate Defender Barbara S. Blackman, for defendant-appellant.*

> HUNTER, JR., Robert N., Judge.

Jason Lynn Young ("Defendant") appeals a jury verdict finding him guilty of first-degree murder of his wife, Michelle Fisher Young ("Michelle"). Defendant argues that the trial court erred by admitting evidence of the entry of a default judgment in a wrongful death action and a child custody complaint against Defendant in his subsequent criminal trial. We agree, vacate the judgment, and remand for a new trial.

## I. Facts & Procedural History

The Wake County Grand Jury indicted Defendant for first-degree murder on 14 December 2009. Defendant's case was tried in Wake County Superior Court on 31 May 2011 with Judge Donald W. Stephens presiding. On 27 June 2011, a mistrial was declared when the jury deadlocked eight to four to acquit Defendant.

Defendant's retrial began at the 17 January 2012 session of Wake County Superior Court, with Judge Stephens again presiding. On 5 March 2012, the jury found Defendant guilty of first-degree murder and sentenced Defendant to life imprisonment without parole. Notice of appeal was given in open court. The testimony presented at trial tended to show the following facts.

### A. State's Evidence

Michelle Young was found at her home by her sister, Meredith Fisher ("Meredith"), around 1:00 p.m. on 3 November 2006. Meredith found Michelle after Defendant called Meredith, asking her to retrieve some printouts of eBay searches for Coach purses. Defendant was out of town on a business trip and left a voicemail for Meredith stating his plan to purchase these purses as a belated anniversary present. Defendant did not want Michelle to find out beforehand.

Meredith complied with Defendant's requests and entered the Youngs' home through the garage door, which was broken, and then through the unlocked kitchen door to the home's mudroom. Meredith noticed her sister's car was in the garage and that her keys and purse were visible near the kitchen counter. After entering, Meredith called out Michelle's name and heard no response. Meredith heard the Youngs' dog, "Mr. G.," whimpering, but she did not see him. The house was cold.

As Meredith ascended the home's stairs, she saw what she thought was dark red hair dye at the top of the staircase in the bathroom of the Youngs' two-and-a-half-year-old daughter, Emily.[1] Meredith first thought that Emily had smeared hair dye around the home and that Michelle would be angry about the mess. When Meredith reached the top of the stairs and looked to the left, she saw Michelle lying on the floor, surrounded by a large amount of blood.

Meredith called 911, and as she did, Meredith said "[Emily] lifted up the covers and just kind of stared at me and I just kind of stared back at her and then she just kind of got on me and clung to me as I called 911." During the call, Emily continually asked for band-aids and said that her mother "has

---

[1] The pseudonym "Emily" is used to protect the identity of the child involved in this case.

boo-boos everywhere." The 911 operator asked Meredith if Michelle had any personal problems, to which Meredith replied "[u]m not really. You know her and her husband fight a little bit, but nothing too ridiculous." Meredith also told the 911 operator that her "niece is very smart for her age" and that she thought Emily was saying "there was somebody in the house." Paramedics and the Wake County Sheriff's Office responded to Meredith's call.

Emily was not injured and appeared "clean" when Meredith arrived, except for some dried blood on Emily's toenails and on the bottom of her pajama pants. Meredith said she did not clean Emily. Emily was wearing fleece pajamas, was not wearing underpants or footwear, and did not urinate or defecate on herself or the bed. Emily clung to Meredith's hip until they both were taken away by emergency personnel. Later, Meredith called her mother Linda Fisher ("Linda") in New York to tell her of Michelle's passing and later told Defendant's mother Pat Young ("Pat") of Michelle's death.

Sheriff's officers found Michelle with a large amount of coagulated, dried blood around her body and with blood splattering against the walls of her bedroom. Michelle's body was discolored, cold, and stiff. She was not wearing shoes and

was dressed in sweatpants and a zip-up sweatshirt. Blood was observed on the opposite side of the bed from where Meredith found Emily. Defendant's DNA and fingerprints were present in the bedroom, although none of his fingerprints contained blood.

Michelle was lying face-down just outside of a closet labeled "his closet." A child's doll was near Michelle's head. Blood was also found on the exterior of this closet, and inside of the closet door. The only blood found outside of the second floor of the Youngs' home was found on the doorknob leading from the kitchen to the garage, and its DNA markers were consistent with Michelle's DNA. No blood was found in or on Defendant's vehicle, his clothes, or in the hotel room where he stayed on 2 November 2006.

The medical examiner who conducted the autopsy, Dr. Thomas Clark ("Dr. Clark"), opined that Michelle experienced blunt force trauma to her head and body. The trauma included a broken jaw, skull fracturing, brain hemorrhaging, lacerations, abrasions, and dislodged teeth. Dr. Clark stated that there were likely at least thirty blows delivered to Michelle, and the medical examiner testified that he thought the blows were inflicted by "a heavy blunt object" with a rounded surface that produced crescent-shaped skull fractures. Dr. Clark said the

autopsy did not produce evidence of a sexual assault against Michelle. Michelle was approximately twenty weeks pregnant when she passed away.

Small footprints in blood, consistent with a child's footprints, were found around the bedroom and at the top of the stairwell landing. Investigators testified that blood was smeared on the walls at a child's level in Emily's bathroom. Investigators said the blood smearing could indicate that Emily was in her bathroom with the door closed. Investigators did not find blood in the sink or bathtub of either the master bathroom or Emily's bathroom.

Several other pieces of evidence were presented by federal, state, and county investigators. Michael Smith of the Federal Bureau of Investigation, Andy Parker of the Wake/Raleigh City and County Bureau of Investigation ("CCBI"), and Karen Morrow of the State Bureau of Investigation testified at trial. Smith, Parker, and Morrow testified that footwear impressions in blood were made by two distinct shoe types on pillows found near Michelle. These included impressions that corresponded with size 12 Hush Puppy Orbital, Sealy, and Belleville shoes which all had the same outsole design. Smith, Morrow, and Parker also testified that there were additional impressions made by a

different shoe type, consistent with a size 10 Air Fit or Franklin athletic shoe. Karen Morrow and Greg Tart of the State Bureau of Investigation testified that Defendant at one time owned size 12 Hush Puppy Orbitals, which were purchased on 4 July 2005. The State never produced shoes matching either of the impressions. The State also never produced a murder weapon.

A jewelry box in the master bedroom had two drawers removed, and DNA testing showed four markers that did not include Defendant or Michelle's DNA. Meredith testified that Michelle "didn't really have a lot of fancy jewelry" except her wedding and engagement rings, and that she "always wore" her wedding and engagement rings. Michelle's wedding and engagement rings were both missing from her body when she was found and the rings were not recovered. Additional unidentified fingerprints were found in the house. Investigators found no signs of forced entry.

Printouts from eBay concerning purses were found on an office printer with three fingerprints; one matched Defendant and two others remain unidentified. Forensic analyst Beth Whitney of the CCBI ("Ms. Whitney") also said Internet searches for purses were made between 7:05 p.m. and 7:23 p.m. on 2 November 2006. Ms. Whitney testified that MapQuest inquiries

for directions between Raleigh and Clintwood, Virginia, were also made that evening, as well as e-mail logins to Defendant's personal email account. Ms. Whitney also found that, at an undetermined time, Internet searches were made on the Youngs' home computer for "anatomy of a knockout," "head trauma blackout," "head blow knockout," and "head trauma."

### i. Evening of 2 November 2006

Michelle's sorority sister and close friend, Ms. Shelly Schaad ("Ms. Schaad"), arrived at the Youngs' home around 6:30 p.m. on 2 November 2006. Ms. Schaad arrived to have dinner and to watch Grey's Anatomy on television with Michelle. Ms. Schaad said she was surprised Defendant was still home. Ms. Schaad picked up dinner on the way to the Youngs' house and invited Defendant to eat. Defendant said he planned to stop at the Cracker Barrel in Greensboro to have dinner, drive three hours to Galax to spend the evening, and then drive two hours the next morning to a 10:30 meeting. As Defendant left for the evening, Ms. Schaad asked Defendant if he would return for the N.C. State football game on 4 November 2006. Defendant said it depended on whether his father-in-law, Alan Fisher, would come for the weekend. Defendant expected his father-in-law to visit, and Defendant had spent the afternoon cleaning the yard in

anticipation of his arrival. Defendant's father-in-law called and cancelled his visit that evening. After he left, Defendant called the Young residence seven times that evening.

Michelle and Ms. Schaad had dinner, bathed Emily, diapered her, and dressed her in pajamas. Michelle and Ms. Schaad talked about an argument between the Youngs over Defendant's mother-in-law, Linda, staying at their home for the majority of the time between Thanksgiving and Christmas. Defendant was upset with the length of her potential stay.

Ms. Schaad testified that she had an "eerie feeling" that evening. Ms. Schaad asked Michelle if she was scared to be alone. Ms. Schaad testified that Michelle

> proceeded to say, you know, Jason's heard a lot of noises lately around the house, you know, but her thoughts were, you know, if -- and her exact words to me, if someone's going to break in and their intention is to kill you, then that's what they're going to do, and it was very unsettling.

Ms. Schaad said she felt like the two were being watched and asked Michelle to walk her to her vehicle before she left that evening.

### ii. Defendant's Location on 2 and 3 November 2006

Defendant purchased gasoline in Raleigh at approximately 7:30 p.m. on 2 November 2006 and then went to a Cracker Barrel

restaurant in Greensboro. Defendant called his mother Pat, who lived in Brevard, while at the Raleigh gas station. Defendant paid for his meal at the Cracker Barrel at 9:25 p.m. and checked into a room at the Hampton Inn in Hillsville, Virginia at 10:54 p.m. Data from the keycards used to gain access to the hotel rooms showed that Defendant entered his room at 10:56 p.m. and did not use his keycard to re-enter his hotel room for the remainder of his stay.

Security camera footage tended to show that Defendant wore a light shirt, jeans, and brown slip-on shoes at the Cracker Barrel and upon entering the Hampton Inn. Two pairs of brown slip-on shoes were found in Defendant's vehicle when police later seized it on 3 November 2006.

Defendant was also captured on video at the hotel just before midnight at the front desk and walking down a hallway that lead to stairs and an exit door, wearing what appeared to be a darker colored shirt with a light-colored horizontal stripe across the chest. Defendant was not shown on surveillance footage for the remainder of the evening.

The night-clerk at the Hampton Inn distributed check-out receipts and hung copies of the USA Today on door handles between 3:00 a.m. and 5:00 a.m. or later. Both the receipt for

Defendant's stay as well as a weekend edition of the USA Today were found in Defendant's Ford Explorer on 3 November 2006, when police seized it.

Early in the morning on 3 November 2006, Hampton Inn Clerk Mr. Keith Hicks ("Mr. Hicks") noticed that the emergency door on the first floor at the western end of the hotel was propped open with a small red rock. Mr. Hicks removed the rock and shut the door. Immediately next to the door was a glass door that could only be accessed via keycard between 11:00 p.m. and 6:00 a.m. A sign next to the door listed the hours the door was locked; at all other times the glass door was unlocked.

When Mr. Hicks returned to the front desk and reviewed the hotel's surveillance cameras, he noticed that the camera was malfunctioning in the same stairwell where the door was left ajar. Mr. Hicks later determined that the camera was unplugged, and Mr. Hicks asked a maintenance worker, Elmer Goad ("Mr. Goad"), to plug the camera in again. Mr. Goad testified that if someone were six feet tall, they would be able to easily reach the camera's plug. The last image from the camera was at 11:19:59 p.m. on 2 November 2006, and no images were recorded until 5:50 a.m. on 3 November 2006, when Mr. Goad got a stepladder and plugged the camera in again.

The camera worked properly from 5:50 a.m. until 6:34 a.m., but at 6:35 a.m., the camera was pointed at the ceiling. Mr. Goad put the camera back in position and focused it on the bottom of the stairs at 6:38 a.m. The hotel said the camera was never unplugged previously and that the only other time that camera was tampered with was several years prior, when some guests snuck in and out of the exit door. CCBI investigator Andy Parker performed a fingerprint analysis on the camera and testified that the State did not find Defendant's fingerprints on the security camera. Investigator Eddie McCormick ("Investigator McCormick") also testified that tests conducted by the State did not show that any fibers were transferred from the Hampton Inn where Defendant stayed on 2 November 2006 to the Youngs' home at 5108 Birchleaf Drive.

The hotel had no record of when Defendant left on 3 November 2006. The State's first evidence showing his location was from a call he made to his mother Pat around thirty miles from the hotel near Wythville, Virginia at 7:40 a.m. Defendant made several calls to his mother and others while driving to Clintwood, with several lasting ten seconds or less. Investigator McCormick testified it was possible the large number of short calls could be from dropped phone calls, but he

also said that "knowing what I know about telephonic investigations," the call frequency reflected a person who was panicked.

Defendant was thirty minutes late to his 10:00 a.m. sales call in Clintwood, Virginia. Defendant purchased gas in Duffield at 12:06 p.m. and then left a voicemail for Meredith.

Detective Richard Spivey of the Wake County Sheriff's Office ("Detective Spivey") testified that his deputy drove between Raleigh and Hillsville, Virginia in two hours and twenty-five minutes without traffic. Three gas receipts were found in Defendant's vehicle, one from Raleigh on 2 November 2006, Duffield on 3 November 2006, and Burlington at 8:32 p.m. on 3 November 2006. Officers also canvassed gas stations between Hillsville and Raleigh. Ms. Gracie Calhoun ("Ms. Calhoun"), who worked at the Four Brothers BP in King, North Carolina, said she saw a man drive to a pump and attempt to pump gas in the early morning hours of 3 November 2006. The State's investigators said that the Four Brothers BP was along the most direct route between Raleigh and Hillsville and was the only gas station open at that particular exit.

Ms. Calhoun was shown a photograph of Defendant's white Ford Explorer on 5 November 2006 and asked if she saw the car on

3 November 2006. When Ms. Calhoun was shown Defendant's photograph, she identified him as the vehicle's driver. Ms. Calhoun was not asked to provide a physical description prior to seeing Defendant's photo, and stated that the Defendant was "just a little bit taller than me," although Ms. Calhoun is five feet tall and Defendant is six-foot-one. Ms. Calhoun stated that she had not seen any news reports about the case when she was asked about the vehicle. Ms. Calhoun said she remembered Defendant specifically because he cursed at her, and that it left an impression because only one other person had ever cursed at her during her tenure at the Four Brothers BP. It is around a forty to forty-five minute drive from the Hillsville Hampton Inn to the Four Brothers BP.

Ms. Calhoun testified that Defendant came into the store and cursed at her because the pumps were not on, threw $20 at her, pumped $15 of gas and drove off without returning for change. Store records showed several gas and in-store purchases between 5:00 a.m. and 5:40 a.m., including a $15 gas purchase at 5:27 a.m. and a $20 gas purchase at 5:36 a.m.

After the first trial concluded, Defendant's counsel learned that Ms. Calhoun had received disability benefits since she was a child. Ms. Calhoun stated that when she was six-

years-old, she was hit by a truck. This accident caused her brain to be dislodged from her skull and to fall onto the street. Doctors reinserted her brain and Ms. Calhoun stated that she has had memory problems her entire life as a result of the accident.

The State presented evidence that a newspaper delivery person passed by the Youngs' home between 3:30 a.m. and 4 a.m. and noticed that the interior, exterior, and driveway lights were on, which she considered unusual at that hour. The delivery person testified that she saw a light colored SUV in front of the home and that a minivan was across the street.

After Defendant arrived and learned from his mother of Michelle's passing, he spoke with Meredith over the phone. Meredith told Defendant to come to her home because the Youngs' home was a crime scene. When speaking to Meredith, he asked about Emily, what had happened, and seemed upset over the phone.

Officers began to question Meredith and friends of the Youngs about possible marital problems. After the questioning, Defendant's friends Josh Dalton and Ryan Schaad suggested he not speak to police until he retained counsel. On counsel's advice, Defendant never answered any questions from law enforcement or spoke about Michelle's death with friends or family.

Defendant arrived at Meredith's home along with his mother, sister, and brother-in-law around 9 or 10 p.m. on 3 November 2006. Defendant hugged Meredith and went to see Emily. Meredith said Defendant was wearing "dress pants, dress shoes, a thermal cut crew neck shirt, a couple buttons here, and a dress shirt over that open." Police arrived at the home and Defendant refused to speak with them. Later in the evening, Defendant and Linda were alone in the home, watching Emily, and Linda said Defendant told her that his lawyer said he could not talk to anyone and that he was "going to take a hit on the house."

### iii. Marital Difficulties

The State produced several witnesses who testified that the Youngs experienced difficulties in their marriage, including Meredith, Ms. Schaad, and Defendant's friend Josh Dalton. Ms. Schaad described the Youngs' relationship as "volatile."

Meredith also noted marital problems between Michelle and Defendant and suggested divorce to Defendant and Michelle. Meredith said the Youngs "would get in screaming matches. They'd fight in public." Meredith testified that on 1 November 2006, Michelle told Meredith that she had fought with Defendant and that he threw a remote at her. Meredith averred that before

her death, Michelle became "withdrawn," "depressed" and "miserable."

On 12 September 2006, Defendant sent an e-mail to the work address of his former fiancée, Genevieve Cargol ("Ms. Cargol") professing his love for her. Defendant and Ms. Cargol did not have contact for several years before this e-mail, which Ms. Cargol did not receive at the time. Ms. Cargol testified that Defendant was violent at several points during their relationship, once punching and breaking Ms. Cargol's car windshield, punching a hole in a wall, and forcibly removing the engagement ring from her finger.

Defendant had extra-marital affairs with two other women while married to Michelle. Defendant communicated with one of these women, Michelle Money ("Ms. Money") regularly and engaged in sexual intercourse in Orlando, Florida on 7 October 2006. Defendant's friend Josh Dalton stated that Defendant said "he felt like he was in love with" Ms. Money. Defendant and Ms. Money discussed meeting on 3 through 5 November 2006, although Ms. Money said Defendant did not want to meet that weekend as he had a business meeting as well as friends and family staying at his home. Defendant and Ms. Money also contacted each other several times by phone on 2–3 November 2006. Ms. Money said

Defendant sounded normal during the calls and that he also mentioned having left printouts in his office for a Coach purse he planned to buy for Michelle. Defendant also had a sexual relationship with a different woman in the Youngs' home while Michelle was out of town on another occasion.

On 27 October 2006, Michelle saw a counselor by herself, Ms. Kimberly Sargent. Ms. Sargent testified that Michelle "cried the entire session." Ms. Sargent said her "assessment of the situation was that [Michelle] was being verbally abused."

### iv. Emily's Statements at Daycare

Emily returned to daycare the Monday after Michelle's death. The State introduced testimony of Emily's daycare teacher, Brooke Bass ("Ms. Bass"). Defendant objected to admitting this testimony and was overruled.

Ms. Bass testified that Emily kept to herself more than usual that week. Ms. Bass said Emily asked for a "mommy" doll and was given a bucket of dolls to play with. Ms. Bass saw Emily select a female doll with long brown hair that Emily called the "mommy doll," and a second female doll with short hair. Ms. Bass stated that Emily began hitting the two dolls together. Another daycare teacher, Ashley Palmatier ("Ms. Palmatier") asked Emily what she was doing and said Emily hit

the dolls together and said "mommy's getting a spanking for biting." Emily then laid the doll face-down on a dollhouse bed, saying "mommy had boo-boos all over, mommy has red stuff all over." Emily's teachers told police what she said at daycare. Ms. Bass testified that Emily did not return to the daycare after these statements were made. These statements were not introduced at Defendant's first trial.

### v. Introduction of Civil Suits

Evidence of two separate civil suits was introduced at Defendant's second trial over Defendant's objection. The State introduced evidence showing Linda, on behalf of the estate, filed a wrongful death action and a request for a slayer declaration against Defendant on 29 October 2008. Defendant did not respond to the suit, and on 5 December 2008, Judge Stephens heard Plaintiff Linda's motion for entry of a default judgment. Judge Stephens reviewed the affidavits and entered a judgment that Defendant "unlawfully killed" Michelle. Defendant was the beneficiary of Michelle's $4 million life insurance policy, but did not make a claim on the policy. Defendant's assets were seized as a result of the $15 million judgment for Linda.

After Michelle's death, Defendant took Emily to Brevard, and the Fisher family was allowed to see Emily at several

visits. Defendant later did not want the Fishers to have contact with Emily. Defendant refused to agree to a visitation schedule, and the Fishers filed suit.

The Fishers filed a child custody complaint against Defendant on 17 December 2008. The complaint said Defendant "brutally murdered Michelle Marie Fisher Young . . . at their residence. Michelle was pregnant with [Defendant's] son at the time of her murder. Upon information and belief [Emily] was in the residence at the time [Defendant] murdered her mother." The lawsuit requested a psychological evaluation of Defendant, and would have required discovery and depositions. Defendant agreed to a consent order and transferred primary physical custody of Emily to Meredith. The consent order required that no discovery or depositions be taken.

### vi. Defendant's Mistrial Testimony

Defendant testified at his first trial, and the State introduced his testimony at the retrial. Defendant denied killing his wife, denied being present when she was killed, and denied having any knowledge of who killed Michelle. Defendant said that he loved Michelle, that he did not plan to divorce Michelle, and that he did not plan to leave Michelle for any of the other women he had sexual relationships with. Defendant

testified that after Emily was born, Michelle had a miscarriage. Defendant said he and Michelle began trying to conceive another child as soon as Michelle received medical clearance to bear another child. Defendant said he was "ecstatic" that he would soon have a son.

Defendant testified that he thought he and Michelle didn't fight much more than other couples, but that the couple "fought more openly than other couples." Defendant said he encouraged his sister-in-law Meredith to mediate disputes between Michelle and Defendant. Defendant testified that his disputes with Michelle never turned physical. Defendant also testified that he had "a lot of guilt" for spending his anniversary weekend with Ms. Money, rather than his wife Michelle, and so he planned to purchase a Coach handbag to "make up for a lot in a big way." Defendant called Meredith several times to retrieve the papers from the family printer because he "really wanted it to be a surprise." Defendant thought that the gift had special significance because it was a leather purse for his and Michelle's third anniversary, which is commonly known as the "leather anniversary."

Defendant said he had just begun a new job with an electronic health records company, and a schedule was set for

him to make a sales call in Clintwood, Virginia. Defendant's sales call was at 10:00 a.m. on 3 November 2006, so Defendant said he planned to "break the trip up" by staying at a hotel about half-way between Clintwood and Raleigh. Defendant said he did not make a hotel reservation prior to staying at the Hampton Inn in Hillsville. After checking into the hotel, Defendant said he called Michelle and Ms. Money.

Defendant said he was nervous about the sales call, as it was his first solo sales call. Defendant said he wanted to review the software on his computer and forgot his charging cable for his computer in his car. Defendant said he left the hotel room door slightly ajar so he could re-enter without disturbing his neighbors. As he left to go to his vehicle, Defendant said he went out the exit door, noticed it was a type of door which would not allow re-entry, broke off a piece of shrubbery to prop the door, retrieved his charger and re-entered the room.

Defendant said he finished on his computer around 11:53 p.m. and said he wanted to smoke a cigar and catch up on some sports news. Defendant said he then picked up a newspaper from the front desk, walked down the hallway, inserted a stick in the door, went outside and smoked. Defendant said he later re-

entered and went to sleep. Defendant also said he arrived thirty minutes late for his appointment the next morning because he had gotten lost. Defendant said he tried to call his appointment to let them know he would be late, but that the cell phone service was "nil to one bar."

After his sales meeting, Defendant drove south toward Brevard, arrived at his mother's house, and his stepfather told him that Michelle was dead. Defendant said he "just broke" and cried. Defendant said some friends called and told him he needed "to get a lawyer before" talking to anyone. Defendant's sister left a message for an attorney she previously employed, and Defendant eventually met with a lawyer, who advised him to not speak with police.

Defendant also said he purchased a pair of brown Hush Puppy Orbital shoes, and that they were donated to Goodwill by Michelle prior to 2 November 2006. Defendant also introduced a photograph of himself in 2007 at Emily's third birthday party, showing Defendant wearing a dark pullover with a stripe on it. Defendant also said he could not afford a lawyer for a custody fight between Defendant and Michelle's family. Defendant also made internet searches on his home computer for head trauma and anatomy of a knockout, which he said he made after being the

"first responder" to a car accident where a person was knocked out.

The State offered several pieces of evidence to rebut Defendant's testimony. The State noted that prior to trial, Defendant received copies of all the State's investigative files, which included field and interview notes. The State's analysis of Defendant's computer activities did not show Defendant completed work-related activities on his computer that evening. The State produced testimony from Meredith and other friends of the Youngs that Defendant did not like smoking and that he disliked the smell of smoke. The State also introduced evidence showing that on 2 November 2006 at 11:40 p.m. it was cold and windy where Defendant said he smoked the cigar. Detective Spivey testified that no "substantial outerwear" besides a suit jacket was found in Defendant's luggage.

The State rested its case on 24 February 2012. Defendant moved to dismiss the case at that time. The trial court denied Defendant's motion, and Defendant began presenting his case on 27 February 2012.

### B. Defendant's Evidence

Defendant's mother Pat said Defendant called her the evening of 2 November 2006 and discussed bringing home a wash

stand and an antique dresser when Defendant's family visited at Thanksgiving. Defendant said he would call Michelle to see if he could spend the evening at their home and pick the furniture up, as he was nearby in southern Virginia. Pat said Defendant noted that he would have to leave early on Saturday to get home for his guests who were attending the N.C. State football game.

Defendant was thirty minutes late to his meeting at Dickinson Hospital with Jennifer Sproles; he said he was lost and was not able to call because of poor cell phone service. Defendant called Pat in the morning on 3 November 2006 to tell her he would pick up a wash stand at her home in Brevard. Defendant introduced testimony from an AT&T analyst who said the large number of short phone calls were consistent with dropped phone calls. Defendant later called Pat asking her to call Meredith about the eBay printouts, which Pat did.

Before Defendant arrived at her home on 3 November 2006, Pat received a call from Linda stating that Michelle was deceased. Pat decided not to tell Defendant over the phone. When Defendant arrived at her home, Defendant's stepfather told Defendant of Michelle's death, and Defendant fell to the ground and began crying.

Defendant's sister Heather McCracken ("Heather") and his brother-in-law, Joe McCracken ("Joe"), came to the home to see Defendant, who was pale, crying, and laying with a blanket draped over himself in a recliner. Joe drove Defendant, Pat, and Heather in his Ford Explorer to Meredith's home in Fuquay-Varina. During the ride, Defendant said he would lose his home and that there was no way he could afford the home. Defendant's luggage remained in his vehicle and Pat said nothing was removed between his arrival in Brevard and their arrival at Meredith's home in Fuquay-Varina.

Pat and Defendant's family later packed up the Youngs' home two months after Michelle's death and found a cigar humidor that said "Quick Set" on the exterior. Defendant previously sold Quick Set locks. A credit card purchase was made on a credit card in Michelle's name at a Tampa, Florida store called "Cigars by Antonio."

Defendant introduced testimony of a newspaper deliveryman who drove by the Youngs' home at 5108 Birchleaf Drive around 3:50 a.m., noticed that nothing seemed unusual, and did not see a vehicle.

A neighbor, Cynthia Beaver ("Ms. Beaver"), testified that she passed by the Youngs' home between 5:20 and 5:30 a.m. and

saw that the home's lights and driveway lights were on, and that there was a light-colored "soccer-mom car" with its lights on and placed at the edge of the driveway. Ms. Beaver said a white male was in the driver's seat and another person was in the passenger's seat, who may have been a female. Another neighbor, Fay Hinsley, said she saw an empty S.U.V. at the edge of the driveway between 6 and 6:30 a.m.

Unlike the first trial, Defendant did not testify at his second trial. Defendant rested his case on 29 February 2012. The jury returned a unanimous verdict finding Defendant guilty of first-degree murder of Michelle. The trial court then entered a life without parole sentence as required by law.

## II. Jurisdiction

Defendant's appeal from the superior court's final judgment lies of right to this Court pursuant to N.C. Gen. Stat. §§ 7A-27(b), 15A-1444(a) (2013).

## III. Analysis

### a. Introduction of Civil Judgment and Pleadings

Defendant argues that introduction of a default judgment and complaint in a wrongful death suit, which stated that Defendant killed Michelle, is reversible error. We agree. Defendant also argues that introducing the child custody

complaint into evidence against Defendant was reversible error. We agree.[2]

Introduction of the complaints and default judgment concern whether the trial court erred by violating N.C. Gen. Stat. § 1-149 (2013). Introduction of this evidence is reviewed *de novo*. *State v. Young*, 324 N.C. 489, 494, 380 S.E.2d 94, 97 (1989) (holding that a violation of a statutory mandates is reviewable *de novo* without objection).

The State argues that *State v. Ashe*, 314 N.C. 28, 331 S.E.2d 652 (1985) precludes *de novo* review of these issues because Defendant cited only Rule 403 of the Rules of Civil Procedure when objecting to introduction of the default judgment and complaint. We disagree. *Ashe* recognizes that "when a trial court acts contrary to a statutory mandate and a defendant is prejudiced thereby, the right to appeal the court's action is preserved, notwithstanding defendant's failure to object at trial." *Id.* at 39, 331 S.E.2d at 659. Further, "'where evidence is rendered incompetent by statute, it is the *duty of the trial judge to exclude it*, and his failure to do so is reversible error, whether objection is interposed and exception

---

[2] Because we grant Defendant a new trial based on the trial court's improper admission of evidence under N.C. Gen. Stat. § 1-149, we do not address Defendant's motion for appropriate relief because it is moot.

noted or not.'" *Christensen v. Christensen*, 101 N.C. App. 47, 54–55, 398 S.E.2d 634, 638 (1990) (quoting *State v. McCall*, 289 N.C. 570, 577, 223 S.E.2d 334, 338 (1976)) (emphasis added), *superseded by statute as stated in Offerman v. Offerman*, 137 N.C. App. 289, 527 S.E.2d 684 (2000).

Under *de novo* review, we examine the case with new eyes. "[*D*]e novo means fresh or anew; for a second time, and an appeal *de novo* is an appeal in which the appellate court uses the trial court's record but reviews the evidence and law without deference to the trial court's rulings." *Parker v. Glosson*, 182 N.C. App. 229, 231, 641 S.E.2d 735, 737 (2007) (quotation marks and citations omitted). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 337, 678 S.E.2d 351, 354 (2009) (quotation marks and citation omitted).

The first issue concerning admitting evidence of the default judgment may also be reviewed as an evidentiary matter *de novo*, for an abuse of discretion, and under plain error. *State v. Mason*, 315 N.C. 724, 731, 340 S.E.2d 430, 435 (1986); *State v. Martinez*, 212 N.C. App. 661, 664, 711 S.E.2d 787, 789

(2011); *State v. Johnson*, 209 N.C. App. 682, 692, 706 S.E.2d 790, 797 (2011).

"When discretionary rulings are made under a misapprehension of the law, this may constitute an abuse of discretion." *Gailey v. Triangle Billiards & Blues Club, Inc.*, 179 N.C. App. 848, 851, 635 S.E.2d 482, 484 (2006).

Plain error is explained in *State v. Lawrence*, 365 N.C 506, 723 S.E.2d 326 (2012):

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Id.* at 518, 723 S.E.2d at 334 (quotation marks and citations omitted).

N.C. Gen. Stat. § 1-149 provides that "[n]o pleading can be used in a criminal prosecution against the party as *proof of a fact admitted or alleged in it*." *Id.* (emphasis added).[3] Further:

---

[3] We note that N.C. Gen. Stat. § 1-149 was not brought to the

> [A] judgment in a civil action is not admissible in a subsequent criminal prosecution although exactly the same questions are in dispute in both cases, for the reason that the parties are not the same, and different rules as to the weight of the evidence prevail.

*State v. Dula*, 204 N.C. 535, 536, 168 S.E. 836, 836–37 (1933) (quotation marks and citation omitted).

*Dula* is a criminal embezzlement case where a civil complaint showing a contract for the sale of thirteen pianos was admitted by the defendant's answer. The defendant alleged in his answer that he had paid the full price of the pianos described in the complaint and had settled the contract with plaintiff's agent. *Dula*, 204 N.C. at 535, 168 S.E. at 836. At the defendant's criminal trial, evidence from the civil pleadings was introduced to show that the pianos involved in the civil dispute were the identical pianos at issue in the criminal dispute, thus seeking to prove a fact from the pleadings in a criminal case. *Id.* at 536, 168 S.E. at 836. The trial court was reversed for allowing this evidence at the defendant's criminal trial. *Id.* at 537, 168 S.E. at 837. Thus, *Dula* provides an example of N.C. Gen. Stat. § 1-149 as applied and

---

trial court's attention by the State or Defendant's counsel. In our review, we did not uncover mention of N.C. Gen. Stat. § 1-149 in common references, such as the Trial Judges' Bench Book.

illustrates the second portion of the statute, namely that civil judgments and/or pleadings may not be used to prove a fact contained therein at a subsequent criminal trial.

In *State v. Wilson*, 217 N.C. 123, 7 S.E.2d 11 (1940), our Supreme Court recognized that reading "certain allegations of fact contained in the complaint in a civil action against [the defendant]" and asking the defendant "if he had not failed to deny them by any answer" would infringe upon the statutory guarantee against using pleadings in "'a criminal prosecution against the party as proof of a fact admitted or alleged.'" *Id.* at 126–27, 7 S.E.2d at 13 (quoting *State v. Ray*, 206 N.C. 736, 737, 175 S.E. 109, 110 (1934)).

*Wilson* was also a criminal embezzlement case where a civil court's order finding the defendant had "made loans to himself of his wards' funds [and] mismanaged the funds belonging to the estate of his wards." *Id.* at 126, 7 S.E.2d at 13. The court didn't question "[t]he propriety of the action of Judge Sink in making the orders referred to," but did find it was "prejudicial to the defendant on this trial, charged with a felony, to have the weighty effect of those statements, opinions and court orders, relative to the matter then being inquired into, laid before the impaneled jury." *Id.* at 126, 7 S.E.2d at 12. The

Supreme Court said it would be proper to cross-examine the defendant at length about his transactions as administrator of the estate for impeachment purposes, "but it would not have been competent for the State to offer affirmative evidence of these collateral matters" unless they were so connected with the indicted charge as to illuminate the question of "fraudulent intent or to rebut special defenses." *Id.* at 127, 7 S.E.2d at 13.

The State cites several cases where civil pleadings and judgments were admitted in a subsequent criminal trial. *State v. Rowell*, 244 N.C. 280, 93 S.E.2d 201 (1956); *State v. Phillips*, 227 N.C. 277, 41 S.E.2d 766 (1947); *State v. McNair*, 226 N.C. 462, 38 S.E.2d 514 (1946); *State v. Fred D. Wilson*, 57 N.C. App. 444, 291 S.E.2d 830, *disc. rev. denied*, 306 N.C. 563, 294 S.E.2d 375 (1982). None of these cases involve default judgments against a defendant, wrongful death judgments against a defendant, or non-testifying defendants. Additionally, these cases involve admitting pleadings and/or judgments in a civil case at a subsequent criminal trial for a different purpose than as proof of a fact alleged in the criminal trial.

In *Rowell*, the defendant was charged criminally for involuntary manslaughter, as he caused his passenger's death

after colliding with a large truck operated by Mr. Wiley Goins. 244 N.C. at 280, 93 S.E.2d at 201. The decedent's estate filed a wrongful death action against Mr. Goins, which was pending at the time of the defendant's trial. *Id.* Mr. Goins testified on behalf of the State, and on cross-examination, the defendant's counsel asked Mr. Goins whether he was facing a wrongful death suit from the decedent's estate. *Id.* The trial court refused to allow Mr. Goins to be cross-examined on the pending lawsuit. *Id.* The Supreme Court reversed the defendant's conviction, holding that cross-examination of the pending civil action would show the bias of the witness and that the witness had an interest in the outcome of the criminal prosecution of defendant. *Id.*

In *Phillips*, the defendant's relationship with his wife deteriorated when his first wife discovered that he had entered into a bigamous marriage with another woman from Raleigh ("second wife"). 227 N.C. at 278-79, 41 S.E.2d at 767. The defendant was charged with murdering his first wife. *Id.* The second wife testified and the Court held that her testimony "was a proper link in the chain of circumstances tending to show motive." *Id.* at 279, 41 S.E.2d at 766. A complaint filed by the second wife to annul the bigamous marriage was also

introduced, but the Court held that the complaint was only used to corroborate the testimony of the second wife and that the error was harmless. *Id.* Thus, the complaint showing a bigamous contract of marriage was not used to show "proof of a fact alleged" by the second wife, but was only used for corroborative purposes. *Id.*

In *McNair*, the defendant was prosecuted for larceny of an automobile. 226 N.C. at 462, 38 S.E.2d at 515. The defendant had filed a civil complaint concerning the ownership of a vehicle and then testified at his criminal trial in a contrary manner from his complaint. *Id.* at 463-64, 38 S.E.2d at 516. The State *explicitly* announced that they were introducing the complaint to impeach the defendant's contrary testimony at trial. *Id.* Thus, the court said "no impingement upon the statute was intended or resulted from the cross-examination." *Id.* at 464, 28 S.E.2d at 516.

In *Fred D. Wilson*, the defendant was prosecuted for obtaining property via false pretenses in a real-estate scheme, and the State presented several outstanding civil judgments against the defendant. 57 N.C. App. at 449-50, 291 S.E.2d at 833. This Court distinguished the case from *Dula*, saying that in *Dula* "pleadings and a civil judgment entered against

defendant were erroneously admitted to prove the same facts necessary to obtain a criminal conviction against the defendant." *Id.* at 450, 291 S.E.2d at 834. This Court held that rather than attempting to prove the truth of the facts underlying the civil judgment, the State was attempting to show the defendant's financial motive for committing his crimes in *Fred D. Wilson*, as he had defaulted on several judgments due to insufficient funds. *Id.*

This Court addresses a different set of facts than *Fred D. Wilson*, *McNair*, *Phillips*, and *Rowell*. Before the re-trial, Defendant's counsel learned that the State planned to introduce evidence about the civil actions against Defendant. Defendant's counsel did not research whether this evidence was admissible, nor did counsel move prior to trial to exclude the evidence on any ground. Rather, Defendant's counsel requested discovery of the civil attorney's files. The State replied that it planned to produce all public records in the civil case, have a witness explain the documents, and cross-examine Defendant if he testified. The trial court held that the evidence could be inquired into at trial, if relevant.

During the trial, Wake County Clerk Lorrin Freeman ("Ms. Freeman") testified that on 29 October 2008, Linda filed a

wrongful death lawsuit against Defendant on behalf of the estate. Ms. Freeman introduced Linda's request for Defendant's disqualification under the slayer statute. Ms. Freeman explained that a wrongful death action is a monetary claim for relief filed against a party who is alleged to have directly caused a decedent's death. The prosecutor requested Ms. Freeman to read the sixth paragraph of the complaint aloud in court in front of the empaneled jury, which said "[i]n the early morning hours of November 3rd, 2006 Jason Young brutally murdered Michelle Young."

Ms. Freeman testified that the file showed no attorney on Defendant's behalf, and she also stated that Defendant did not respond to the suit. Ms. Freeman explained that by failing to answer, Defendant's action had "the legal implication or the legal result of the defendant having admitted the allegations as set forth in the complaint." Ms. Freeman entered a default on 2 December 2008 and thereafter, Linda moved for a default judgment and slayer declaration.

Judge Stephens heard the motion on 5 December 2008. Ms. Freeman testified, over Defendant's objection, that Judge Stephens reviewed the evidence and attachments to the motion and entered a judgment declaring that Defendant killed Michelle.

Ms. Freeman also testified that Defendant could have presented evidence in the civil action, and Defendant levied a Rule 403 objection.

In sum, Ms. Freeman read aloud a civil judgment that declared Defendant had killed his wife. Ms. Freeman read aloud that Judge Stephens, the presiding judge in Defendant's criminal trial, entered judgment against Defendant after reviewing the evidence. Ms. Freeman read aloud that Defendant did not respond to the complaint and informed the jury that his action was legally operative as an admission under a civil standard. Additionally, the trial court admitted a "Child Custody Complaint Motion for Psychological Evaluation" into evidence without any restrictions which also included statements that Defendant had killed his wife Michelle.

The State did not offer an explicit purpose at trial for offering evidence of the default judgment nor did the State offer a purpose for admitting the child custody complaint. The State now articulates an impeachment purpose on appeal, asserting that the civil pleadings and judgment were used to show Defendant's unusual reaction to civil suits and to show Defendant's silence in not responding to the lawsuits cast doubt on his subsequent testimony at his first trial. The State also

argues the purpose of introducing the evidence contained in the civil filings was to "show that [Defendant] had great incentives to answer the civil matters and explain the evidence." This stated purpose demonstrates the State's intention of introducing these civil pleadings and judgments: to show proof of Defendant's guilt, in violation of N.C. Gen. Stat. § 1-149.

Further, the State's argument that the civil suits were used to cast doubt on Defendant's 22 June 2011 testimony concerns testimony that the State actually introduced at the second trial. This purpose was not stated at trial, and the impeachment value of introducing these civil suits remains unclear, as Defendant did not file a custody complaint, nor did he testify at the second trial. Essentially, the State is requesting to impeach evidence it offered.

Secondly, the State cannot articulate a corroborative purpose for this evidence. These civil complaints would only be useful in corroborating the opinions of guilt made by Michelle's mother, Linda Fisher. Linda's opinions are themselves inadmissible, leaving no proper corroborative purpose. *State v. Kim*, 318 N.C. 614, 621, 350 S.E.2d 347, 351 (1986). No *res judicata* effect was applicable. *Dula*, 204 N.C. at 536, 168 S.E. at 837.

The jury instructions did not explicitly prohibit the jury from using the default judgment or the child custody complaint filed against Defendant as proof of Defendant's guilt in the criminal case. The trial court ruled that the civil matters "might be relevant to any number of matters that the jury has already heard and will hear." However, the transcript shows the trial court did not articulate a clear basis for admitting either item or the limited purposes for which the jury could use these judgments:

> If a civil complaint is filed by plaintiff and the parties in a civil action are designated plaintiff, the person bringing the complaint, and the defendant, the person or entity being sued, if a civil complaint is filed by a plaintiff with the clerk of Superior Court, Lorrin Freeman and her office, and if a civil summons is issued by an officer of the court commanding the defendant named in the complaint to respond and otherwise answer to the allegations of the complaint within the time required by law and if the defendant named in the complaint is properly served with this complaint and this summons and if the defendant is an adult and is not otherwise incapacitated or in the military and if the defendant fails to file an answer to that civil complaint or otherwise respond to the allegations within the time required by law and if the plaintiff filing the complaint moves that the court to enter judgment in the plaintiff's favor by reason of that failure to respond or answer, then under the rules of civil law in civil cases and under the rules of the court a judgment can be

entered in favor of the plaintiff bringing the lawsuit. Both failure for the defendant named to respond or otherwise answer the allegations, for purposes of the civil case that's been filed the allegations of the complaint under those circumstances, whether actually true or not, which have not been denied by the named defendant are deemed in the civil law to have been admitted for the purpose of allowing the plaintiff to have judgment entered in the plaintiff's favor. The entry of a civil judgment is not a determination of guilt by any court that the named defendant has committed any criminal offense.

. . . .

I further instruct you there is evidence that tends to show that a civil complaint was filed in the Civil Superior Court of Wake County against the defendant by Linda Fisher on behalf of the Estate of Michelle Young and that a civil summons was issued by the clerk of the court commanding the defendant to answer or otherwise respond to the allegations of that civil complaint within the time required by law. There is further evidence that tends to show that the defendant was timely served with these documents and that he did not file an answer or otherwise respond to the complaint and that a default judgment was entered against him by reason of that failure.

As I previously instructed you, when a defendant in a civil action has been properly served with the civil summons and the civil complaint and fails to timely respond, upon motion of the plaintiff the Court is authorized to enter a civil judgment against the defaulting defendant. For purpose of the civil law, the allegations of the complaint which have not

been denied, whether actually true or not, are deemed to be admitted for the purpose of allowing the plaintiff to have a civil judgment entered against the defendant. The burden of proof in a civil case requires only that the plaintiff satisfy the Court or the jury by the greater weight of the evidence that the plaintiff's claims are valid. This means that the plaintiff must prove that the facts are more likely than not to exist in the plaintiff's favor. When there is a default, that burden of proof is deemed in law to be met.

The entry of a civil default judgment is not a determination of guilt by the Court that the named defendant has committed any criminal offense.

Still further, the State does not point to an instance where a trial court has attempted to gain admission of a default judgment and a slayer determination in a homicide prosecution. Defendant points our attention to *In re J.S.B.*, 183 N.C. App. 192, 202, 644 S.E.2d 580, 586, *writ denied, review denied*, 361 N.C. 693, 652 S.E.2d 645 (2007), as an example where this Court held that a voluntary manslaughter finding from a termination of parental rights proceeding could not be used if the State commenced a subsequent criminal prosecution against that defendant.

Admitting the wrongful death judgment, the complaint in that case, and the complaint in the child custody case were also abuses of discretion. "When the intrinsic nature of the

evidence itself is such that its probative value is always necessarily outweighed by the danger of unfair prejudice, the evidence becomes inadmissible under [Rule 403] as a matter of law." *State v. Scott*, 331 N.C. 39, 43, 413 S.E.2d 787, 789 (1992). Defendant's presumption of innocence was irreparably diminished by the admission of these civil actions. This is similar to the prejudice that a jury has when it learns a defendant is previously convicted of a charged offense. *State v. Lewis*, 365 N.C. 488, 498, 724 S.E.2d 492, 499 (2012). Criminal judgments are clearly admissible in slayer actions. *Quick v. United Benefit Life Ins. Co.*, 287 N.C. 47, 57, 213 S.E.2d 563, 569 (1975). However, as Defendant states, the converse is typically not true because admitting such evidence creates great prejudice against the Defendant's innocence and increases the chance that an unreliable guilty verdict may be rendered. Even greater still is the prejudice to Defendant when a juror is told that the presiding judge in the case reviewed the evidence before the jury and entered a default judgment against a defendant. The danger of unfair prejudice vastly outweighed the probative value in this case and admission of the evidence was abuse of discretion in Defendant's trial. It is also an abuse of discretion to make a ruling under a

misapprehension of the law as occurred here, where the trial court conducted no inquiry concerning N.C. Gen. Stat. § 1-149.

Because the trial court disregarded a statute, we hold the trial court erred in admitting evidence of both the entry of default judgment against Defendant and the child custody complaint against Defendant, and because entry of both items was prejudicial to Defendant, we hold that Defendant must receive a new trial. Because we hold that the trial court violated § 1-149 in admitting these civil matters, we do not address Defendant's arguments concerning judicial opinions or Defendant's argument that insufficient evidence existed to deny a motion to dismiss. We continue to address the admissibility of Emily's statements and evidence of Defendant's silence. We address these issues because they are likely to recur at Defendant's re-trial.

### b. Admission of Emily's Statements at Daycare

Defendant argues that statements made by Emily to daycare workers that were admitted via the workers' testimony were hearsay outside the scope of any exception and/or overwhelmingly prejudicial. Defendant objected to this evidence at trial. This issue is an evidentiary issue that is reviewed *de novo*. "When the admissibility of evidence by the trial court is

preserved for review by an objection, we review the trial court's decision *de novo*." *Martinez*, 212 N.C. App. at 664, 711 S.E.2d at 789. "When preserved by an objection, a trial court's decision with regard to the admission of evidence alleged to be hearsay is reviewed *de novo*." *Johnson*, 209 N.C. App. at 692, 706 S.E.2d at 797.

The State argues that Defendant did not preserve this issue for appellate review. We disagree. After the prosecution advised the court outside the jury's presence that it would put forth two witnesses that would relate Emily's statements at daycare, the following dialogue occurred between Defendant's counsel and the trial court:

> THE COURT: Okay. I know you've objected to the testimony of the witness. We heard Ms. Palmatier Friday afternoon. I take it you object to this line of testimony and evidence in its entirety.
>
> [DEFENSE COUNSEL]: We would, your Honor, on grounds previously stated.
>
> THE COURT: As I understand, your position is that the statement of the child is hearsay and not otherwise admissible, as well as it's not a foundation to show that the capacity of the child to fully understand and appreciate and relate her observations due to her age and that her conduct is also ambiguous.
>
> [DEFENSE COUNSEL]: That is correct, your Honor, as well as confrontation/cross-

examination grounds and due process and 403.

THE COURT: And as I understand it, you object to any testimony with regard to the child herself because you contend the testimony with regard to the child is not relevant to any issue in these proceedings.

[DEFENSE COUNSEL]: That is correct.

THE COURT: I mean, the learning and her schooling and observations about the folks at school and things like that.

[DEFENSE COUNSEL]: That is correct, your Honor.

THE COURT: All right. Well, I do believe it is relevant and I have overruled your previous objections and your objections are preserved for the record and the objection goes to the testimony of every witness on this subject as I understand it.

This portion of the trial transcript demonstrates the trial court's granting of a line or continuing objection pursuant to N.C. Gen. Stat. § 15A-1446(d)(10) (2013); *State v. Crawford*, 344 N.C. 65, 76, 472 S.E.2d 920, 927 (1996). While Defendant's counsel objected to a question on redirect asking the first daycare worker to compare the size of the dolls to Defendant and Michelle, this was a properly lodged objection as it exceeded the scope of the granted line objection, although the objection was sustained. Defendant's second objection when the second daycare worker took the stand and began to relate hearsay

statements was a simple reaffirmation of the originally granted line objection. Therefore *de novo* review of this issue is appropriate.

The State presented the testimony of Emily's daycare worker, Ms. Palmatier. Ms. Palmatier testified during *voir dire* that on 9 November 2006 she told a Wake County detective that Emily hit two female dolls together with a dollhouse chair and said, "[M]ommy's getting a spanking for biting. . . . [M]ommy has boo-boos all over." Ms. Palmatier then testified that, after a nap, Emily said "[Mommy] fell on the floor. Now she's on the bed with animals, animals were in the barn, they were asleep. There was a cow. Daddy bought me new fruit snacks." The State argued that this was evidence Emily saw the murder, and that it was probative of Defendant's identity as she was later found unharmed.

Defendant's counsel objected to this evidence, citing hearsay, due process, lack of competency, relevance, and undue prejudice. The trial court ruled that (1) the statements met the present sense impression, excited utterance, and residual hearsay exceptions; (2) the evidence was relevant to determine the killer's identity; and (3) the evidence was more probative than prejudicial.

The court *sua sponte* excluded Emily's post-nap statements and granted the defense a continuing objection to Emily's testimony. The trial court instructed the jury that evidence was being introduced of Emily's observations, made when she "may have had some memory" of Michelle's death. The trial court instructed the jury that it could use Emily's statements to determine whether Emily witnessed a portion of the assault on Michelle.

Emily's daycare teacher then testified that on 9 November 2006, Emily asked her for "the mommy doll." The teacher gave Emily a bucket of dolls. Emily picked two dolls, one female with long hair and one with short hair, and hit them together. Ms. Palmatier testified that she saw Emily strike a "mommy doll" against another doll and a dollhouse chair while saying, "[M]ommy has boo-boos all over" and "[M]ommy's getting a spanking for biting. . . . [M]ommy has boo-boos all over, mommy has red stuff all over."

Defendant first argues that the evidence was not relevant. Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401. "A

trial court's rulings on relevancy are technically not discretionary, though we accord them great deference on appeal." *State v. Lane*, 365 N.C. 7, 27, 707 S.E.2d 210, 223 (2011). We agree with the State that the evidence clearly related to the identity of Michelle's assailant. The evidence was probative that Emily observed her mother's assault, and that the assailant cared for Emily in some way, as he or she left Emily unharmed after the assault.

Secondly, Defendant argues that the statements made at daycare were inadmissible hearsay and do not fit within any hearsay exception. We hold the statements are hearsay, but that they fit within the excited utterance exception pursuant to this Court's decisions in *State v. Rogers*, 109 N.C. App. 491, 501, 428 S.E.2d 220, 226, *cert. denied*, 334 N.C. 625, 435 S.E.2d 348 (1993), *cert. denied*, 511 U.S. 1008 (1994), and *State v. Thomas*, 119 N.C. App. 708, 712–14, 460 S.E.2d 349, 352–53, *disc. review denied*, 342 N.C. 196, 463 S.E.2d 248 (1995).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c). A "statement" is an oral or written

assertion or "nonverbal conduct of a person . . . intended by him as an assertion." N.C. Gen. Stat. § 8C-1, Rule 801(a).

Emily's statements consisted of striking the "mommy" doll while saying, "[M]ommy's getting a spanking for biting" and "[M]ommy has boo-boos all over, mommy has red stuff all over." The trial court found that these were statements made by Emily, and that they were offered for the truth of the matter asserted. We agree, and note that the trial court also found that these phrases spoken by Emily were to describe past events via the words and actions of a two and a half year old child. The age of Emily at the time of the statements likely meant she could express herself in a limited way as to her observations. Fact-finders may find that an alternate meaning exists when considering the words of young children who lack the verbal clarity often present in adults. *See, e.g.*, *State v. Smith*, 315 N.C. 76, 80, 337 S.E.2d 833, 837 (1985) (considering statements of a young child that used figurative language to describe a sex act).

However, if a statement is hearsay, it may still be admitted if it falls within one of the exceptions to the hearsay rule. The primary exception at issue in this case is the excited utterance exception. N.C. Gen. Stat. § 8C-1, Rule

803(2). For the excited utterance exception to apply, "there must be (1) a sufficiently startling experience suspending reflective thought and (2) a spontaneous reaction, not one resulting from reflection or fabrication." *Smith*, 315 N.C. at 86, 337 S.E.2d at 841. "The rationale underlying the admissibility of an excited utterance is its inherent trustworthiness." *State v. Guice*, 141 N.C. App. 177, 200, 541 S.E.2d 474, 489 (2000), *opinion adhered to as modified on reconsideration*, 151 N.C. App. 293, 564 S.E.2d 925 (2002).

Excited utterances are often made and admitted into evidence because they fall within a timeframe that is close in proximity to the startling event. *See*, *e.g.*, *id.* at 201, 541 S.E.2d at 489 (finding a statement made to an officer within "several minutes" of the defendant dragging the victim from the home and while struggling to breathe fell within the requisite time frame). However, this Court has held that "the stress and spontaneity upon which the exception is based [are] often present for longer periods of time in young children than in adults." *Rogers*, 109 N.C. App. at 501, 428 S.E.2d at 226 (quotation marks and citation omitted); *see also Smith*, 315 N.C. at 87-88, 337 S.E.2d at 841 ("This ascertainment of prolonged stress is born of three observations. First, a child is apt to

repress the incident. Second, it is often unlikely that a child will report this kind of incident to anyone but the mother. Third, the characteristics of young children work to produce declarations 'free of conscious fabrication' for a longer period after the incident than with adults." (citation and quotation marks omitted)).

Our State's appellate courts have thus extended the length of time that the excited utterance exception may apply. *See Smith*, 315 N.C. at 79, 86–90, 337 S.E.2d at 836, 841–43 (four and five-year-olds' statements made two to three days after being sexually abused were admissible); *Thomas*, 119 N.C. App. at 712–14, 460 S.E.2d at 352–53 (five-year-old's statements made four to five days after sexual abuse were admissible); *Rogers*, 109 N.C. App. at 501, 428 S.E.2d at 226 (five-year-old's statements made three days after sexual abuse admissible).

Thus, the outer time limit at present is four to five days from the event a child has made statements about. Emily was also younger than the other children discussed above in prior cases this Court has considered. Emily's statements were made six days after her mother was killed and were made while she played with dolls, without prompting or questioning from adults. We hold that the attendant circumstances in this case merit

application of the excited utterance exception and that the trial court did not err in admitting Emily's statements. Because we hold Emily's statements were admitted properly under the excited utterance exception to the hearsay rule, we do not address whether the present sense impression or residual exception apply to this case.

### c. Defendant's Silence as Substantive Evidence

The trial court offered the following jury instructions as they relate to Defendant's refusal to speak with police and his family members:

> Ladies and gentlemen, the Fifth Amendment to the United States Constitution protects a citizen's right to refuse to answer questions of the police during a criminal investigation. The exercise of that Constitutional right may not be used as evidence against that citizen later at trial to create an inference of guilt. Therefore, the defendant's decision not to answer questions by law enforcement officers during the criminal investigation may not be considered against him as evidence of guilt to the pending charge. However, that same Fifth Amendment does permit the jury to consider the defendant's refusal to answer police questions to the extent that the evidence surrounding that refusal bears upon the defendant's truthfulness if the defendant elects to testify or made a statement at a later time. The evidence presented in this case tends to show that the defendant elected to testify at a prior trial.

Therefore, I instruct you that you may consider evidence of the defendant's refusal to answer police questions during this investigation for one purpose only. If, in considering the nature of that evidence, you believe that such evidence bears upon the defendant's truthfulness as a witness at his prior trial, then you may consider it for that purpose only. Except as it relates to the defendant's truthfulness, you may not consider the defendant's refusal to answer police questions as evidence of guilt in this case.

I also instruct you that this Fifth Amendment protection applies only to police questioning. It does not apply to questions asked by civilians, including friends and family of the defendant and friends and family of the victim.

Defendant argues that the trial court committed plain error by instructing the jury that it could consider Defendant's failure to speak with friends and family as substantive evidence of guilt. We disagree and find that the instruction was proper.

The Fifth Amendment's protection against self-incrimination does not extend to questions asked by civilians. *Oregon v. Elstad*, 470 U.S. 298, 304-05 (1985) ("The Fifth Amendment, of course, is not concerned with nontestimonial evidence. *Nor is it concerned with moral and psychological pressures to confess emanating from sources other than official coercion.*" (citations and quotation marks omitted) (emphasis added)).

Defendant argues that Defendant's silence in response to questions from non-officers should be offered for impeachment purposes only. Defendant cites *State v. Mack*, 282 N.C. 334, 339-40, 193 S.E.2d 71, 75-76 (1972), and *State v. Hunt*, 72 N.C. App. 59, 61, 323 S.E.2d 490, 492 (1984), *aff'd without precedential value*, 313 N.C. 593, 330 S.E.2d 205 (1985), for the proposition that pre-arrest silence may only be used to impeach a defendant's pre-trial statement or trial testimony. *Mack* held that "[p]rior statements of a witness which are inconsistent with his present testimony are not admissible as substantive evidence because of their hearsay nature." 282 N.C. at 339, 193 S.E.2d at 75; *see also State v. Black*, ___ N.C. App. ___, ___, 735 S.E.2d 195, 202 (2012) (citing *Mack*, 282 N.C. at 339-40, 193 S.E.2d at 75)), *appeal dismissed, review denied*, ___ N.C. ___, 738 S.E.2d 391 (2013). However, *Mack* concerned the substantive use of silence within the context of a testifying non-party witness making statements to a police officer. 282 N.C. at 339, 193 S.E.2d at 75. *Hunt* was affirmed without precedential value by the North Carolina Supreme Court, 313 N.C. at 593, 330 S.E.2d at 205, but also involved silence with respect to police questioning. 72 N.C. App. at 61-62, 323 S.E.2d at 492.

Defendant's friends and family asked him about Michelle's murder on several occasions and Defendant did not offer statements to his friends and family about the evening's events. The State contends that Defendant's later version of events offered at his first trial were inconsistent with his earlier silence and that the discrepancy "tend[s] to reflect the mental processes of a person possessed of a guilty conscience seeking to divert suspicion and to exculpate [himself]." *State v. Redfern*, 246 N.C. 293, 298, 98 S.E.2d 322, 326 (1957) (holding that conflicting statements amount to "substantive evidence of substantial probative force, tending to show consciousness of guilt"). Defendant's silence to non-officers may provide substantive evidence of guilt because statements or silence to questioning from non-police officers are not granted the same protections under the Fifth Amendment and are probative of Defendant's mental processes. Thus, the evidence was proper for substantive consideration by the jury.

Defendant also argues that the trial court committed plain error in offering its jury instruction. Defendant argues that the trial court should have instructed the jury that the evidence did not create a presumption of guilt, was insufficient alone to establish guilt, and that the evidence could not be

considered as to premeditation and deliberation. *State v. Myers*, 309 N.C. 78, 88, 305 S.E.2d 506, 512 (1983). Defendant argues that a new trial was required because the case was "entirely circumstantial." *Id.*

In *Myers*, the defendant objected to the instruction, the witnesses relied upon by the State had severe credibility issues, and the trial court placed an "emphasis upon the negative aspect of defendant's statements." *Id.* Here, there was minimal mention by the State that Defendant was silent to his friends and family. We hold that Defendant's pre-arrest silence coupled with evidence that whoever killed Michelle did so with premeditation and deliberation and the limited referral to Defendant's silence about the murder to friends and family did not rise to the level of plain error having a probable impact on the verdict. *See Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334.

## IV. Conclusion

The introduction into evidence of the civil complaints and judgment was in error and violated N.C. Gen. Stat. § 1-149, as the evidence was used to prove a fact — namely, that Defendant had killed Michelle — Defendant is deemed to have admitted in the wrongful death civil action and which had been alleged in

the child custody proceeding.    This evidence also severely impacted Defendant's ability to receive a fair trial.    As such, we order a

NEW TRIAL.

Judges STROUD and DILLON concur.