IN THE SUPREME COURT OF NORTH CAROLINA

No. 124PA14

(Filed 21 August 2015)

STATE OF NORTH CAROLINA

v.

JASON LYNN YOUNG

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 756 S.E.2d 768 (2014), vacating a judgment entered on 5 March 2012 by Judge Donald W. Stephens in Superior Court, Wake County, and remanding for a new trial. Heard in the Supreme Court on 19 May 2015.

> *Roy Cooper, Attorney General, by Daniel P. O'Brien, Special Deputy Attorney General, and Amy Kunstling Irene, Assistant Attorney General, for the State-appellant.*
>
> *Staples S. Hughes, Appellate Defender, by Barbara S. Blackman, Assistant Appellate Defender, for defendant-appellee.*

ERVIN, Justice.

Defendant Jason Lynn Young was convicted of the first-degree murder of his wife, Michelle Fisher Young. A unanimous panel of the Court of Appeals vacated defendant's conviction and ordered a new trial. We now reverse the Court of Appeals' decision and remand this case to the Court of Appeals for consideration of defendant's remaining challenges to the trial court's judgment.

I. Factual Background

A. Substantive Facts

1. State's Evidence

a. Youngs' Marital Difficulties

As of 2 November 2006, the Youngs had been married for slightly more than three years. The Youngs' friends assumed that their courtship, which had been less than idyllic, resulted in marriage solely because Ms. Young became pregnant. The Youngs' relationship was described as "volatile," with the couple tending to argue in public over relatively petty matters. Ms. Young's sister, Meredith Fisher, thought that defendant was irresponsible and treated Ms. Young poorly. Although Meredith Fisher told Ms. Young that she should leave defendant, Ms. Young made no effort to divorce her husband. On one occasion, defendant told a friend that he was afraid that, if he and Ms. Young divorced, Ms. Young would leave the Raleigh area and move to New York with their two-and-one-half-year-old daughter, Emily.[1]

Among the sources of conflict which the Youngs experienced was the role played by Ms. Young's mother, Linda Fisher, who visited the Youngs for extended periods of time, wanted to move to North Carolina so that she could spend more time with her daughter and granddaughter, and offered to renovate the Youngs' house so that she could live there. Although Ms. Young wanted to have her mother's

---

[1] "Emily" is a pseudonym used throughout this opinion to protect the identity of the Youngs' daughter.

assistance with the family cooking, cleaning, and child care responsibilities, defendant was adamantly opposed to sharing a residence with Linda Fisher.

On 12 September 2006, defendant sent an e-mail to an address that had been used by his former fiancée, Genevieve Cargol. During their engagement, defendant had engaged in acts of domestic violence against Ms. Cargol, including an incident in which he forcibly removed the engagement ring that he had given her. Although he had not had any contact with her for a couple of years, defendant professed his love for Ms. Cargol in the 12 September 2006 e-mail while indicating that he did not intend to act on his feelings.

At the end of September 2006, defendant began communicating on a regular basis with Michelle Money, who was one of Ms. Young's college sorority sisters and who believed that her husband was being unfaithful to her. On 7 October 2006, defendant mailed an anniversary card to Ms. Young from Orlando, Florida, where he had gone to spend time with Ms. Money. Defendant had sexual intercourse with Ms. Money during his visit to her in Orlando and informed a friend that he had fallen in love with Ms. Money. In the thirty days prior to 2 and 3 November 2006, defendant and Ms. Money exchanged over 400 calls and text messages.

About ten days prior to Ms. Young's death, defendant had sexual intercourse with Carol Ann Sowerby, another family friend, in the Youngs' residence. Ms. Young was out of town at the time that this incident occurred. On that occasion, defendant

took Ms. Sowerby's wedding ring from her and pretended to swallow it. However, defendant returned Ms. Sowerby's ring on the following day.

The Youngs e-mailed each other on 24 October 2006 about the extent to which they should undergo marriage counseling. Although defendant reiterated his willingness to attend counseling sessions, he reminded Ms. Young that the two of them had agreed that she would obtain individual counselling first. During a session with a therapist on 27 October 2006, Ms. Young stated that she was upset that defendant waited until the end of the weekend before doing his household chores, that their childless friends had more money than the Youngs did, that defendant wanted their relationship to be more sexual in nature, and that defendant drank at tailgate parties. On the other hand, Ms. Young told the therapist that her current pregnancy was planned.

About three weeks prior to Ms. Young's death, defendant told a friend after having had an argument with his wife that "he was done." On 27 October 2006, defendant stated in the presence of both Ms. Young and Meredith Fisher that "all of this would just, you know, go away if you'd let me have a girl on the side." Although Ms. Young did not claim to have been physically abused by her husband, the therapist concluded that Ms. Young had experienced verbal abuse. Ms. Young told Meredith Fisher that defendant had thrown a remote control device at her on 1 November 2006.

b. Events Occurring on 2-3 November 2006

i. Events Involving Ms. Young

As a result of the fact that defendant was scheduled to conduct a sales call in Clintwood, Virginia, at 10:00 a.m. on Friday, 3 November 2006, Ms. Young made plans to spend the evening of 2 November 2006 with her friend Shelly Schaad, whose husband was also expected to be out of town on the evening in question. When Ms. Schaad arrived at the Youngs' residence at approximately 6:30 p.m. on 2 November 2006, she was surprised to discover that defendant was still at home. Although he was invited to stay and dine with Ms. Schaad and Ms. Young, defendant declined this invitation and indicated that he planned to eat at a Cracker Barrel while en route to Galax, Virginia, where he intended to spend the night before continuing on to Clintwood in the morning.

After Ms. Schaad and Ms. Young ate dinner, they bathed Emily, diapered her, and dressed her in her pajamas. During this process, Ms. Young told Ms. Schaad that she and defendant had been arguing about plans for the upcoming holidays. Although Ms. Young wanted Linda Fisher to stay with the family from Thanksgiving through Christmas, defendant was opposed to such a lengthy visit. While Ms. Schaad and Ms. Young watched *Grey's Anatomy*, defendant made one of the seven calls that he placed to the house that evening.

In view of the fact that she had an "eerie feeling" that the house was being watched, Ms. Schaad asked Ms. Young to walk her to her car when she left the

Youngs' residence between 10:00 and 10:30 p.m. According to Terry Tiller, a newspaper delivery person, certain interior, exterior, and driveway lights were on and a light-colored SUV was positioned in the yard or on the street in front of the Youngs' residence when she passed it between 3:30 and 4:00 a.m. on 3 November 2006.

ii. Events Involving Defendant

After buying gas in Raleigh at 7:30 p.m. on 2 November 2006, defendant called his mother, Pat Young. During this conversation, defendant discussed his business trip, his plans for the Thanksgiving holiday, and certain items of furniture that his mother planned to give him. Among other things, defendant told Pat Young that he would check with Ms. Young to see if he could spend Friday night at his mother's residence in Brevard in order to pick up the furniture that Pat Young planned to give him before leaving for Raleigh early Saturday morning.

After purchasing dinner at a Cracker Barrel restaurant in Greensboro at 9:25 p.m., defendant traveled in his white Ford Explorer to Hillsville, Virginia, where he checked into a Hampton Inn at 10:54 p.m. According to surveillance camera footage taken at both the Hampton Inn and the Cracker Barrel, defendant was wearing a light shirt, jeans, and brown slip-on shoes. Although defendant entered his hotel room using a key card at 10:56 p.m., he never used that key card again. Just before midnight, hotel surveillance cameras showed defendant at the front desk and as he walked down a hallway leading to both the stairs providing access to the upper floors

and to an exit door on the western end of the hotel. At that time, defendant was wearing a darker-colored shirt with a light-colored horizontal stripe across the chest. No further images of defendant appear on surveillance footage taken at the hotel during the remainder of the night of 2 to 3 November 2006.

Keith Hicks, an employee of the Hillsville Hampton Inn, slid checkout receipts under the doors leading to occupied guest rooms between 3:00 and 5:00 a.m. on 3 November 2006. At approximately the same time, Mr. Hicks hung copies of the weekend edition of *USA Today* on the door handles of the same rooms. After taking advantage of the Hampton Inn's express checkout service, defendant left the hotel on 3 November 2006 without going to the front desk. As a result of the fact that he did not check out in person, the Hampton Inn had no record of the actual time at which defendant left the premises. However, defendant did call his mother at 7:40 a.m. on 3 November, with this call having been made using a cell tower near Wytheville, Virginia. Defendant arrived about thirty minutes late for his 10:00 a.m. sales call.

### iii. Defendant's Testimony at the First Trial

In his testimony at the first trial, which the State introduced into evidence at the second trial, defendant denied having killed his wife, having been present when she was killed, or having any knowledge of who had killed her. Although defendant admitted that he had not been a good husband, he claimed that he loved his wife, wanted their marriage to work, and was ecstatic that his wife had become pregnant with a boy before her death. Defendant did not believe that he and Ms. Young argued

more than other couples. Instead, defendant thought that the only difference between the Youngs and other couples was that the Youngs argued more in public. Defendant denied having ever assaulted his wife.

In November 2006, defendant had obtained a new job selling electronic health records software. After his employer set up the Clintwood sales call for relatively early on the morning of 3 November 2006, defendant decided to stay overnight at a hotel between Raleigh and Clintwood instead of attempting to make the entire drive that morning. Upon checking in at the Hillsville Hampton Inn on the night of 2 November, defendant called both his wife and Ms. Money. As a result of the fact that he was nervous about the sales call that he was scheduled to make the following morning, defendant decided to review the demonstration software that he intended to use during that meeting. However, when he began the review process, defendant discovered that he had left his laptop charger in his car.

Upon making this determination, defendant left the door to his room unlatched and walked downstairs to the exit nearest to the place where he had parked. In view of the fact that the exit door would not open from the exterior without a key card and the fact that he had left his key card in his room, defendant broke a stick off of a nearby shrub and stuck it in the door while he went to retrieve his charger. After returning to his room and reviewing the materials for the upcoming sales meeting,

defendant decided to obtain a copy of *USA Today* and smoke a cigar.[2]  As a result, defendant left his room without fully closing the door for a second time, got a copy of *USA Today* from the desk clerk, walked down a hallway to the exit door, stuck another stick in the door, and went outside to smoke his cigar.  Once he had finished his cigar, defendant re-entered the hotel, returned to his room, and went to sleep. Defendant claimed that he had been late to his sales call in Clintwood on the following morning because he had gotten lost.

### iv. Testimony of Ms. Calhoun

The Four Brothers BP in King, North Carolina, a service station located at an exit along the most direct route between Raleigh and Hillsville, was the only location at which gasoline could be purchased at that exit in the early morning hours of 3 November 2006.[3]  According to Gracie Calhoun, an employee at the Four Brothers BP station, a man drove a white SUV to the farthest pump at approximately 5:00 to 5:30 a.m. on 3 November 2006 and made repeated efforts to pump gas.  After the man entered the store and cursed her because the pumps were not operational, Ms. Calhoun told the prospective customer that, at that time of day, customers must provide money or identification before the gasoline pumps would be activated.  At

---

[2] A number of witnesses testified that defendant did not smoke and hated smoking. However, a humidor was found in the Youngs' house after Ms. Young's death and a credit card owned by Ms. Young was used to purchase cigars in 2004.

[3] An investigating officer made the trip from Hillsville to Raleigh in a Ford Explorer during a time when traffic was light in two hours and twenty-five minutes.

that point, the man, whom Ms. Calhoun identified from a photograph presented to her by investigating officers and in open court as defendant,[4] threw twenty dollars in cash at her, returned to the pump at which his vehicle was parked, and pumped fifteen dollars' worth of gasoline into his vehicle before driving off without collecting his change. According to receipts obtained by investigating officers, a fifteen dollar gasoline purchase was made at the Four Brothers BP station at 5:27 a.m. on 3 November 2006 and a twenty dollar gasoline purchase was made at the Four Brothers BP station some nine minutes later.

### v. Hampton Inn Security Cameras

Early on 3 November 2006, Mr. Hicks discovered that the first floor emergency door that led from the western stairwell to the exterior of the hotel and that is ordinarily locked between 11:00 p.m. and 6:00 a.m. had been propped open with a small red rock that had been obtained from a nearby landscaping bed. After removing the rock, Mr. Hicks shut the door. Upon returning to the front desk, at which still images from the ten surveillance cameras utilized in the hotel could be observed on a rotating basis, Mr. Hicks noticed that the camera in the stairwell associated with the door that had been propped open was not working and returned to that stairwell to investigate the situation. At that point, Mr. Hicks noticed that the camera had been

---

[4] In her trial testimony, Ms. Calhoun claimed to have been face-to-face with the man in the store and to have gotten a good look at him. On cross-examination, Ms. Calhoun acknowledged that she had been hit by a truck when she was six years old and sustained a brain injury for which she continued to collect disability benefits and which had left her with lasting memory problems.

unplugged, with the last image shown on that camera having been made at 11:19:59 p.m. on 2 November 2006. No images were made on the camera in question from 11:20:13 p.m. on 2 November 2006 until Elmer Goad, a Hampton Inn maintenance employee, plugged it back in at 5:50 a.m. on 3 November 2006. However, the camera in question did not remain fully operational for long, since someone pointed it toward the ceiling between 6:34 and 6:35 a.m.

<u>c. Discovery of Ms. Young's Body</u>

Meredith Fisher arrived at the Youngs' residence at around 1:00 p.m. on 3 November 2006 in response to a request from defendant, who had left a voice mail on her cell phone asking her to go the house to pick up the printouts relating to an eBay search for Coach purses that defendant had conducted before leaving on his sales trip so that Ms. Young would not find them. According to Meredith Fisher, defendant claimed that he had been thinking of surprising his wife with a purse as a belated anniversary present.

After arriving at the house, Meredith Fisher entered the residence through the unlocked garage and went into the kitchen. As she walked upstairs in the direction of the home office, Meredith Fisher saw what looked like red hair dye in the bathroom that Emily normally used. Meredith Fisher saw more of the red substance on the upstairs landing and in the master bedroom. Once Meredith Fisher had seen her sister's body on the floor of the master bedroom, she realized that the red substance that she had observed at various locations throughout the house was blood.

As Meredith Fisher called 911, Emily, who was not wearing a diaper, emerged from under the covers on the bed in the master bedroom. Emily repeatedly asked that she be given band-aids on the grounds that Ms. Young had "boo-boos everywhere."[5] In response to an inquiry posed by the 911 operator about the extent to which Ms. Young had "personal problems," Meredith Fisher replied, "Um not really. You know her and her husband fight a little bit, but nothing too ridiculous."

A paramedic who came to the Youngs' residence in response to Meredith Fisher's call confirmed that Ms. Young had been dead for some time. In addition, the paramedic checked Emily and determined that she was calm, had not sustained any injuries, and was not dehydrated. As a result of the fact that Emily was clean except for the presence of dried blood on her toenails and the bottom and seat of her pajama pants, an officer asked Meredith Fisher if she had cleaned Emily and received a negative answer.

### d. Investigative Discoveries

A large amount of dried blood was found around Ms. Young's body, which was discolored, cold, and stiff. In addition, blood spattering appeared on the walls of the master bedroom. According to Dr. Thomas Clark, who performed the autopsy on her body, Ms. Young died from blunt force trauma to her head. Although he did not

---

[5] After returning to day care following Ms. Young's death, Emily was observed striking two dolls against each other. When asked what she was doing, Emily said that the "mommy doll" was being "spanked" for biting and was covered with "red stuff" and "boo-boos."

express any opinion concerning the time at which Ms. Young had died, Dr. Clark did state that Ms. Young had sustained at least thirty blows, the most serious of which had probably been inflicted with a heavy blunt object featuring a rounded surface that caused crescent-shaped skull fractures. In addition, Dr. Clark found signs that Ms. Young had been subjected to manual strangulation. Although Ms. Young had sustained a broken jaw, skull fracturing, brain hemorrhaging, lacerations, abrasions, and dislodged teeth, there was no evidence that she had been the victim of a sexual assault. Ms. Young was approximately twenty weeks pregnant with a son at the time of her death.

Emily's bloody footprints were visible on the floor of the master bedroom, her bathroom, and the second floor landing. In addition, blood smears at the level of a child's height were present in Emily's bathroom. The only blood found outside of the second floor of the Youngs' home appeared on the doorknob leading from the kitchen to the garage, with the DNA markers present in this bloodstain being consistent with Ms. Young's DNA.

Although defendant's DNA and fingerprints were present in the bedroom, none of his fingerprints were blood-stained. At the time that he was examined by officers of the Wake County Sheriff's Office on 7 November 2006, defendant did not have any cuts, bruises, or other injuries to his hands or body aside from a bruised and broken toenail. In addition, investigating officers failed to find any evidence of blood in or on

defendant's vehicle, defendant's clothes, or the hotel room in which defendant stayed on 2 November 2006.

According to Agent Michael Smith of the Federal Bureau of Investigation, Agent Andy Parker of the Raleigh/Wake City-County Bureau of Identification, and Special Agent Karen Morrow of the State Bureau of Investigation, bloody footwear impressions made by two distinct shoe types appeared on pillows found near Ms. Young. One of these two sets of footprints was consistent with the impressions that would be made by size twelve Hush Puppy Orbital, Sealy, and Belleville shoes, all of which have the same outsole design. The other set of impressions was made by a shoe type consistent with a size ten Air Fit or Franklin athletic shoe. According to Special Agent Morrow and Special Agent Greg Tart of the SBI, defendant had purchased a pair of size twelve Hush Puppy Orbitals on 4 July 2005, which defendant claimed had been donated to Goodwill. The State never produced a pair of shoes that matched either of these sets of impressions, although investigating officers recovered two pairs of brown shoes from defendant's vehicle on 3 November 2006.[6]

A careful examination of the Youngs' residence indicated that there were no signs that entry had been forced or that the house had been ransacked. However, investigating officers determined that two drawers had been removed from a jewelry

---

[6] A checkout receipt from the Hillsville Hampton Inn and a copy of the weekend edition of *USA Today* were recovered from defendant's Ford Explorer on 3 November 2006 as well.

box in the master bedroom. DNA testing performed on the jewelry box revealed the presence of four markers that were not consistent with either of the Youngs' DNA. According to Meredith Fisher, Ms. Young "didn't really have a lot of fancy jewelry" with the exception of her wedding and engagement rings, which she rarely removed and did not keep in the jewelry box. Neither of the rings that Meredith Fisher mentioned was found on Ms. Young's body or ever recovered.

According to Agent Beth Whitney of the CCBI, Internet searches for purses were made on the Youngs' computer between 7:05 p.m. and 7:23 p.m. on 2 November 2006. Although three fingerprints were lifted from the eBay printouts generated as a result of these searches, only one of them was defendant's, with the other two fingerprints remaining unidentified at the time of trial. In addition, investigating officers determined that someone had checked defendant's personal e-mail account and that MapQuest inquiries for directions between Raleigh and Clintwood had been made on the Youngs' computer on the evening of 2 November 2006 as well. Agent Whitney also discovered that, at some undetermined time, Internet searches concerning the "anatomy of a knockout," "head trauma blackout," "head blow knockout," and "head trauma" had been conducted on the Youngs' computer, which defendant explained as having been related to an accident that he had witnessed. Finally, an examination of defendant's laptop computer revealed no indication that that machine had been used for any work-related purpose on the night of 2 to 3 November 2006.

2. Defendant's Evidence

On the afternoon of 3 November 2006, Linda Fisher called Pat Young and told her that Ms. Young was dead. At that time, defendant was driving from Virginia to Pat Young's residence in Brevard. After defendant's arrival in Brevard, his stepfather told defendant of Ms. Young's death. Upon receiving this information, defendant sank to the ground in disbelief. In addition, defendant sobbed after Meredith Fisher told him that Ms. Young's death had been a homicide.

Shortly after his arrival in Brevard, defendant and various members of his family left for Raleigh in defendant's Explorer, from which defendant's luggage had not been removed. As he traveled to Raleigh, defendant received calls from friends who told him that investigating officers had been asking Meredith Fisher and others if the Youngs had been having marital problems and suggested that he refrain from talking to investigating officers before consulting an attorney. In accordance with advice that he received from his counsel, defendant never answered any questions posed by investigating officers or discussed Ms. Young's death with friends or family members.

A newspaper delivery person drove by the Youngs' home at approximately 3:50 a.m. on 3 November 2006 without noticing anything unusual. Cynthia Beaver noticed that the house and driveway lights were on and that a light-colored "soccer-mom car" in which a white male was seated in the driver's seat and another person, who was possibly female, was seated in the passenger seat, was positioned at the edge

of the driveway associated with the Youngs' residence when she drove by at approximately 5:20 to 5:30 a.m. on the same date. When Fay Hinsley drove past the Youngs' house at approximately 6:15 a.m. on 3 November 2006, she observed an empty SUV positioned at the edge of the driveway. Although she testified that the car she had seen was not on Birchleaf Drive, on which the Youngs' residence was located, Ms. Hinsley insisted that she had seen the car at the Youngs' house.

## B. Procedural History

On 14 December 2009, the Wake County Grand Jury returned a bill of indictment charging defendant with murdering Ms. Young. The charge against defendant came on for trial before the trial court and a jury at the 31 May 2011 criminal session of the Superior Court, Wake County. On 27 June 2011, the trial court declared a mistrial after the jury announced that it could not reach a unanimous verdict.

The charge against defendant came on for trial a second time at the 17 January 2012 session of the Superior Court, Wake County, before the trial court and a jury. On 5 March 2012, the jury returned a verdict convicting defendant of first-degree murder. Based upon the jury's verdict, the trial court entered a judgment sentencing defendant to a term of life imprisonment without parole. Defendant noted an appeal to the Court of Appeals from the trial court's judgment.

Before the Court of Appeals, defendant argued that the trial court had committed prejudicial error by allowing the admission of evidence concerning a

complaint that had been filed and default judgments that had been entered in a wrongful death and declaratory judgment action that had been brought against him by Linda Fisher as executrix of Ms. Young's estate and a complaint that had been filed in an action in which Linda Fisher and Meredith Fisher sought to obtain custody of Emily from defendant. *State v. Young*, __ N.C. App. __, __, 756 S.E.2d 768, 778 (2014). On 1 April 2014, the Court of Appeals filed an opinion holding that the trial court had committed prejudicial error by admitting evidence concerning the complaint and default judgments in the wrongful death and declaratory judgment action and the complaint in the child custody case on the grounds that the admission of the challenged evidence violated N.C.G.S. § 1-149, and N.C.G.S. § 8C-1, Rule 403. *Id.* at __, __, 756 S.E.2d at 782-84. We now reverse the Court of Appeals' decision and remand this case to the Court of Appeals for consideration of defendant's remaining challenges to the trial court's judgment.

## II. Legal Analysis

### A. Relevant Factual Information

#### 1. Wrongful Death Action

At the second trial, the State was allowed to introduce evidence concerning a civil action that had been filed against defendant. On 29 October 2008, Linda Fisher, acting in her capacity as the executrix of Ms. Young's estate, filed a complaint seeking a damage recovery from defendant for wrongful death and a declaration that defendant was disqualified from receiving any monetary benefit as the result of Ms.

Young's death pursuant to the provisions of Chapter 31A of the General Statutes. After defendant failed to file an answer or other responsive pleading, the estate sought the entry of default judgments against defendant. The estate's motion for the entry of a default judgment in the declaratory judgment action was heard before the trial court on 5 December 2008, at which point the trial court reviewed the record and certain affidavits that had been submitted in support of the estate's request for a declaratory judgment and entered a judgment determining that defendant had "unlawfully killed" Ms. Young, and was a "slayer" as that term is used in N.C.G.S. § 31A-3(3)d. Subsequently, Judge W. Osmond Smith, III, entered a default judgment in the wrongful death action awarding damages in excess of fifteen million dollars to Ms. Young's estate.

At trial, the State called Lorrin Freeman, who served as Clerk of Superior Court for Wake County at that time, for the purpose of testifying concerning the wrongful death and declaratory judgment action.[7] At that point, defendant's trial counsel objected "to the entire line of questioning about the wrongful death case." Defense counsel added: "And we would cite basically Rule 403, that we believe that to the extent [that it's] probative of anything that the danger of confusing, misleading, undue prejudice to the defendant substantially outweighs the probative value, and

---

[7] At the time that the State made reference to evidence concerning the wrongful death and declaratory judgment action in its opening statement, defendant's trial counsel objected to the prosecutor's argument. After initially sustaining defendant's objection, the trial court allowed the prosecutor to argue that defendant "allowed a civil judgment to be entered against him."

don't wish to be heard further."  In response, the trial court ruled that the fact that a

wrongful death and declaratory judgment action had been filed and that defendant,

the primary beneficiary under Ms. Young's policy of life insurance,

> elected to be defaulted and in response to the wrongful
> death action and permitted by law for the Court to enter a
> judgment disqualifying him from benefiting from the death
> of Michelle Young may be a factor, that is, might be
> relevant to any number of matters that the jury has
> already heard and will hear and are considering, and so I
> do believe it's relevant and I do believe that the probative
> value outweighs any prejudicial effect.

After making this ruling, the trial court indicated that it would instruct the jury about

"the law relating to a civil action and a civil judgment," "the obligation of the

defendant named to answer," and the law allowing entry of a default judgment in the

event that a defendant failed to file an answer or other responsive pleading.

After the prosecutor asked Ms. Freeman whether a civil action had been filed

against defendant by Linda Fisher on behalf of Ms. Young's estate, defendant lodged

another objection.  After overruling the objection, the trial court outlined the

procedures utilized in civil actions, advised the jury that judgment could be entered

in the plaintiff's favor in the event that the defendant failed to respond to the

plaintiff's complaint, explained to the jury that allegations made in a civil complaint

are deemed to have been admitted when no responsive pleading is filed "whether

actually true or not," and instructed the jury that the entry of a "civil judgment is not

a determination of guilt by any court that the named defendant has committed any

criminal offense." Following the delivery of these instructions, which the trial court indicated would be supplemented at the conclusion of the trial, Ms. Freeman explained the nature of a wrongful death action and an action pursuant to N.C.G.S. § 31A-3(3)d; read the allegation contained in the complaint to the effect that, "[i]n the early morning hours of November 3rd, 2006 Jason Young brutally murdered Michelle Young at their residence"; reported that defendant never filed an answer or other responsive pleading in the wrongful death and declaratory judgment action; stated that a hearing at which Ms. Young's estate intended to seek the entry of a default judgment in the declaratory judgment action pursuant to N.C.G.S. § 31A-3(3)d was noticed for 5 December 2008; confirmed that this notice of hearing had been served on defendant and Roger Smith, Jr., an attorney with whom defendant had consulted during the investigation of Ms. Young's death; indicated that various items of evidence were presented for the trial court's consideration; and, over a renewed objection, testified that the trial court had entered a default judgment in the declaratory judgment action finding that defendant had "unlawfully killed [Ms. Young] . . . within the definition of [s]layer in the civil law." At a later time, Ms. Freeman testified, Judge Smith entered a default judgment in the wrongful death action in which he awarded Ms. Young's estate "[o]ver $15 million."[8]

---

[8] Similarly, Michael Schilawski, who represented Linda Fisher and Meredith Fisher in the child custody action, testified, without objection, that the trial court stated in its declaratory ruling judgment that defendant "quote, [w]illfully and unlawfully killed, unquote, [Ms. Young], and as a result of that judgment the defendant is barred from collecting

On cross-examination, Ms. Freeman testified that the attorneys representing Ms. Young's estate in the wrongful death and declaratory judgment action filed affidavits in support of the estate's motion for the entry of a default judgment, described the items that those attorneys examined during their investigation into the validity of the claims that the estate had asserted against defendant, and stated the amount of money that the estate and its attorneys had obtained as a result of the entry of these default judgments. On redirect examination, Ms. Freeman testified that an autopsy report concerning the cause of Ms. Young's death was contained in the file relating to the wrongful death and declaratory judgment action and that the affidavit executed by one of the attorneys who represented Ms. Young's estate in those proceedings had asserted that, "in his opinion . . . [defendant] brutally murdered [Ms.] Young at their residence."

At the conclusion of the trial, the trial court delivered additional instructions to the jury concerning the manner in which they should consider the evidence that they had heard concerning the wrongful death and declaratory judgment action. More specifically, the trial court instructed the jury that:

> I further instruct you there is evidence that tends to show that a civil complaint was filed in the Civil Superior Court of Wake County against the defendant by Linda Fisher on behalf of the Estate of Michelle Young and that a civil summons was issued by the clerk of the court commanding the defendant to answer or otherwise respond

---

any insurance proceeds payable on [Ms. Young's] life or from inheriting any property from [Ms. Young's] estate."

to the allegations of that civil complaint within the time required by law.  There is further evidence that tends to show that the defendant was timely served with these documents and that he did not file an answer or otherwise respond to the complaint and that a default judgment was entered against him by reason of that failure.

As I previously instructed you, when a defendant in a civil action has been properly served with the civil summons and the civil complaint and fails to timely respond, upon motion of the plaintiff the Court is authorized to enter a civil judgment against the defaulting defendant.  For purpose of the civil law, the allegations of the complaint which have not been denied, whether actually true or not, are deemed to be admitted for the purpose of allowing the plaintiff to have a civil judgment entered against the defendant.  The burden of proof in a civil case requires only that the plaintiff satisfy the Court or the jury by the greater weight of the evidence that the plaintiff's claims are valid.  This means that the plaintiff must prove that the facts are more likely than not to exist in the plaintiff's favor.  When there is a default, that burden of proof is deemed in law to be met.

The entry of a civil default judgment is not a determination of guilt by the Court that the named defendant has committed any criminal offense.

Neither party lodged any objection to this portion of the trial court's instructions to the jury concerning the evidence relating to the wrongful death and declaratory judgment action.

### 2. Child Custody Action

On 17 December 2008, Linda Fisher and Meredith Fisher filed a complaint seeking the entry of an order awarding them custody of Emily after defendant had denied their requests for access to his daughter.  In their complaint, Linda Fisher and

Meredith Fisher alleged that defendant had "brutally murdered" Ms. Young and that, "[u]pon information and belief, [Emily] was in the residence at the time [defendant] murdered her mother." In their prayer for relief, Linda Fisher and Meredith Fisher requested that defendant be subject to discovery and submit to a psychological evaluation. After the filing of this custody action, defendant entered into a consent judgment with Linda Fisher and Meredith Fisher pursuant to which the parties agreed that Meredith Fisher would have primary physical custody of Emily and that no discovery or psychological examination of defendant would be conducted.

The child custody action initially came to the jury's attention during the cross-examination of Meredith Fisher, when defendant's trial counsel asked her about the filing of the child custody complaint and the request that defendant be subject to a psychological examination. After the State, without objection, sought and obtained the admission of the child custody complaint into evidence, Mr. Schilawski testified, also without objection, that Linda Fisher and Meredith Fisher had alleged in the child custody complaint that, "[i]n the early morning hours of November 3rd, 2006 the defendant brutally murdered [Ms. Young] at their residence" at a time when Ms. Young "was pregnant with defendant's son" and, upon information and belief, when Emily "was in the residence." After defendant filed a motion seeking a change of venue, the parties entered into negotiations resulting in the entry of a consent judgment under which "primary physical custody was awarded to Meredith Fisher" after the completion of a transitional process, the parties "waive[d] the right to

conduct discovery with respect to each other," and defendant was absolved from any responsibility for submitting to a psychological evaluation.

### B. Admissibility of the Challenged Evidence

The Court of Appeals held that the trial court erred by allowing the admission of evidence concerning the wrongful death and declaratory judgment complaint and default judgments and the child custody complaint on the grounds that the trial court's decision contravened N.C.G.S. § 1-149 and N.C.G.S. § 8C-1, Rule 403. We do not, however, believe that defendant properly preserved his challenge to the admission of any of the challenged evidence on the basis of N.C.G.S. § 1-149 for purposes of appellate review. In addition, we do not believe that defendant properly preserved his challenge to the admission of evidence concerning the child custody complaint for purposes of appellate review on any grounds. Finally, we conclude that defendant's challenge to the admission of evidence concerning the wrongful death and declaratory judgment complaint and judgments as violative of N.C.G.S. § 8C-1, Rule 403 lacks merit. As a result, the Court of Appeals' decision must be reversed and this case remanded to the Court of Appeals for consideration of defendant's remaining challenges to the trial court's judgment.

### 1. N.C.G.S. § 1-149

In seeking relief from the Court of Appeals' decision, the State contends that the Court of Appeals erred by determining that defendant was entitled to a new trial on the grounds that the admission of evidence concerning the wrongful death and

declaratory judgment action and the child custody action violated N.C.G.S. § 1-149. Among other things, the State contends that defendant failed to properly preserve his challenge to the admission of this evidence for purposes of appellate review on the grounds that, as defendant appears to acknowledge, no objection to the admission of the challenged evidence as violative of N.C.G.S. § 1-149 was asserted in the trial court. As a result, the first issue that we must address is the extent, if any, to which defendant's failure to object to the admission of the challenged evidence in reliance upon N.C.G.S. § 1-149 in the court below precludes us from reaching the merits of defendant's claim. N.C. R. App. P. 10(a)(1) ("In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context" and "obtain[ed] a ruling upon the party's request, objection, or motion.").

N.C.G.S. § 1-149 provides, in pertinent part, that "[n]o pleading can be used in a criminal prosecution against the party as proof of a fact admitted or alleged in it." N.C.G.S. § 1-149 (2013). Although the literal language of N.C.G.S. § 1-149 relates solely to the contents of pleadings, this Court has reviewed the admissibility of any evidence relating to civil pleadings or judgments utilizing the standard set out in N.C.G.S. § 1-149 rather than limiting the applicability of N.C.G.S. § 1-149 to the contents of such documents. *See State v. Wilson*, 217 N.C. 123, 126-27, 7 S.E.2d 11, 12-13 (1940) (excluding evidence concerning both a pleading and an order in a civil

case); *State v. Dula*, 204 N.C. 535, 536-37, 168 S.E. 836, 836-37 (1933) (excluding evidence concerning the contents of a civil pleading and a civil judgment). As a result, N.C.G.S. § 1-149 requires the exclusion of any evidence relating to the allegations and determinations made in the course of civil litigation "as proof of a fact admitted or alleged in it." N.C.G.S. § 1-149.

According to the Court of Appeals, the fact that defendant did not object to the admission of evidence concerning the complaint filed and default judgments entered in the wrongful death and declaratory judgment action and the complaint filed in the child custody action on the basis of N.C.G.S. § 1-149 at trial does not preclude consideration of defendant's challenge to the admission of this evidence as violative of N.C.G.S. § 1-149 on the merits despite the absence of a contemporaneous objection in the trial court given that the admission of the challenged evidence involved judicial "act[ion] contrary to a statutory mandate." *State v. Ashe*, 314 N.C. 28, 39, 331 S.E.2d 652, 659 (1985); *see also State v. McCall*, 289 N.C. 570, 576, 223 S.E.2d 334, 337 (1976) (stating that "[w]hen . . . evidence rendered incompetent by statute was admitted, it became the duty of the trial judge to exclude the testimony, and his failure to do so must be held reversible error whether exception was noted or not" (quoting *State v. Porter*, 272 N.C. 463, 468, 158 S.E.2d 626, 630 (1968))). After careful consideration, however, we hold that the legal principle upon which the Court of Appeals relied in reaching the merits of the claim that defendant has asserted on the basis of N.C.G.S. § 1-149 does not apply in this instance.

As an initial matter, we note that the extent to which the admission of evidence related to civil actions in criminal proceedings is subject to appellate review despite the failure of the defendant to object under N.C.G.S. § 1-149 was addressed by this Court, albeit in dictum, in *State v. Stephenson*, 218 N.C. 258, 10 S.E.2d 819 (1940). In *Stephenson*, the defendant was convicted of insurance fraud after he burned his tobacco packhouse for the purpose of collecting insurance proceeds. *Id.* at 259, 262, 10 S.E.2d at 820, 822. The State, without objection, introduced the verified complaint that the defendant had filed against his insurance company for the purpose of obtaining a recovery under his fire insurance policy. *Id.* at 261, 10 S.E.2d at 821. After hearing closing arguments and receiving the trial court's instructions, the jury took the verified complaint to the jury room for use during its deliberations. *Id.* at 262-63, 10 S.E.2d at 822. On appeal, the defendant challenged the jury's use of the complaint during its deliberations without raising any objection based upon the fact that the document in question had been admitted into evidence. *Id.* at 263, 10 S.E.2d at 822. After quoting from what is now N.C.G.S. § 1-149, this Court stated that, "[t]hough the complaint was admitted in evidence, without objection, *which amounted to waiver of objection thereto*, it was not permissible for the jury to take it into the jury room without the consent of defendant or of his counsel." *Id.* at 265, 10 S.E.2d at 824 (emphasis added) (internal citations omitted). As a result, this Court has clearly indicated that a failure to object to the admission of evidence that

allegedly violates N.C.G.S. § 1-149 results in a waiver of the right to challenge the admission of that evidence on appeal.

A careful comparison of the statutory provisions that this Court has treated as "mandatory" with the language contained in N.C.G.S. § 1-149 establishes that our dictum in *Stephenson* reflected a correct understanding of the applicable law. For example, the statutory provision held to be mandatory in *Ashe* provided that, "[i]f the jury, after retiring for deliberation requests a review of certain testimony or other evidence, *the jurors must be conducted to the courtroom*," at which point "[t]he judge *in his discretion*, after notice to the prosecutor and defendant, may direct that requested parts of the testimony be read to the jury and may permit the jury to reexamine in open court the requested materials admitted into evidence." 314 N.C. at 33-34, 331 S.E.2d at 656 (quoting N.C.G.S. § 15A-1233(a) (emphases added)). Similar language appears in other statutory provisions that this Court has treated as "mandatory." *See, e.g., State v. Davis*, 364 N.C. 297, 302, 698 S.E.2d 65, 68 (2010) ("*Unless the conduct is covered under some other provision of law providing greater punishment*, the following classifications apply to the offenses set forth in this section: . . . (2) Felony death by vehicle is a Class E felony. . . . (4) Felony serious injury by vehicle is a Class F felony." (quoting N.C.G.S. § 20-141.4(b) (2009) (emphasis added))); *State v. Young*, 324 N.C. 489, 494, 380 S.E.2d 94, 97 (1989) (citing N.C.G.S. § 15A-1222 ("The judge *may not express* during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." (emphasis

added)), and *id.* § 15A-1232 ("In instructing the jury, the judge *shall not express* an opinion as to whether or not a fact has been proved . . . ." (emphasis added))); *McCall*, 289 N.C. at 575, 223 S.E.2d at 337 (stating that N.C.G.S. § 8-57 provided that "defendant's wife was not a competent witness to testify against him, and her failure to testify for him could not be used to his prejudice"). As a result, the statutory provisions that this Court has treated as "mandatory" either include language that requires the trial court to act in a very specific manner or renders certain types of evidence inadmissible for any purpose whatsoever.

The language contained in N.C.G.S. § 1-149 cannot be deemed "mandatory" as that term is used in *Ashe* and similar cases. As a result, N.C.G.S. § 1-149 does not render civil pleadings and judgments invariably inadmissible as a matter of law in every criminal case in the same way that compelled spousal testimony concerning areas outside the statutorily specified exceptions is rendered inadmissible by the current version of N.C.G.S. § 8-57. On the contrary, a trial court required to evaluate the validity of an objection lodged in reliance upon N.C.G.S. § 1-149 must determine whether there is a permissible purpose for which the evidence in question can be admitted, with the ultimate issue being whether the evidence is relevant for some purpose other than proving the same facts found, admitted, or alleged in the civil proceeding in question.

The necessity for the trial court to conduct such an inquiry is repeatedly noted in this Court's jurisprudence concerning N.C.S.G. § 1-149. On the one hand, this

Court has precluded the admission of evidence concerning the allegations and admissions contained in civil pleadings. In *Dula*, in which the defendant was charged with embezzling monies that he had collected from the sale of thirteen pianos, 204 N.C. at 535, 168 S.E. at 836, the State offered into evidence the complaint, answer, verdict, and judgment from a civil action in which the piano company had successfully sued the defendant under a consignment contract for the purpose of recovering the amount that the defendant had collected for selling the pianos in question, *id.* at 536, 168 S.E. at 836. As we noted in our opinion, the State offered this evidence for the purpose of showing that the defendant had received the pianos and sold them without delivering the sales proceeds to the company from which he had procured them, a set of facts that provided the basis for the embezzlement charge that had been lodged against the defendant. *Id.* at 536, 168 S.E. at 836. Although the evidence in question was admitted in the trial court, we overturned the defendant's conviction on the grounds that the evidence concerning the civil filings and orders had been unlawfully admitted during the criminal trial for the purpose of proving the same facts that were alleged or admitted in the related civil matter. *Id.* at 536, 168 S.E. at 836-37. Similarly, we held in *Wilson* that evidence concerning the contents of certain civil pleadings was not admissible at the defendant's embezzlement trial given that the challenged evidence was offered for the purpose of proving that, as guardian of an estate, the defendant had improperly made loans to himself and mismanaged funds. 217 N.C. at 126-27, 7 S.E.2d at 13. As a result, our decisions construing N.C.G.S. §

1-149 clearly prohibit the admission of civil pleadings or judgments for the purpose of proving the facts alleged, admitted, or found in those documents.

On the other hand, in *State v. McNair*, 226 N.C. 462, 38 S.E.2d 514 (1946), we recognized that a party's decision to seek the admission of a civil judgment in a criminal case does "not necessarily use the pleading as proof of any fact therein alleged," *id.* at 464, 38 S.E.2d at 516, and stated that the admissibility of a civil pleading in a criminal trial hinges on the purpose for which the challenged evidence is offered, *id.* at 463-64, 38 S.E.2d at 516. In upholding the trial court's decision to permit the prosecutor to cross-examine the defendant concerning a civil suit in which the defendant had claimed to be the owner of a vehicle that he was alleged to have stolen, this Court stated that:

> The solicitor announced that the object of the cross-examination relative to the complaint in the civil action, was "to impeach the witness or to contradict him," and not to prove any of the facts alleged therein, as they were at variance with the theory of the State's case. The purpose of the solicitor was to use the allegations of the complaint in the civil action, not "as proof of a fact admitted or alleged in it," but to show that the defendant had made two contradictory statements about the matter, neither of which was correct.

*Id.* at 463-64, 38 S.E.2d at 516. Similarly, in *State v. Phillips*, 227 N.C. 277, 279, 41 S.E.2d 766, 767 (1947), we held that evidence concerning an annulment action brought against the defendant by his second wife, which had been offered for the purpose of proving that he had a motive to kill his first wife rather than to prove that

he was a party to a bigamous marriage, was properly admitted. Thus, this Court has clearly allowed the admission of evidence concerning the contents of criminal pleadings for purposes other than showing the truth of the allegations and admissions contained in those documents.

As a result, given the fact that N.C.G.S. § 1-149 does not contain any mandatory language and given that the prior decisions of this Court do not treat evidence concerning the allegations, admissions, and findings contained in civil pleadings and judgments as invariably inadmissible in criminal cases, we hold that N.C.G.S. § 1-149 is not a "mandatory" statute the violation of which is cognizable on appeal despite the absence of an objection in the trial court. The same logic upon which the Court of Appeals relied in reaching a contrary result would necessarily result in treating most of the provisions of the North Carolina Rules of Evidence as "mandatory," a result that would be contrary to the manner in which this Court has treated evidentiary arguments that were not supported by an objection lodged at trial for most of its history. As a result, since defendant did not object to the admission of evidence concerning the wrongful death and declaratory judgment complaint and default judgments on the basis of N.C.G.S. § 1-149, he is not entitled to challenge the admission of this evidence as violative of that statutory provision on appeal. The

same is true of his challenge to the admission of evidence concerning the child custody complaint. The Court of Appeals erred in reaching a contrary conclusion.[9]

### 2. N.C.G.S. § 8C-1, Rule 403

Secondly, the State contends that the Court of Appeals erred by holding that the trial court abused its discretion in overruling defendant's objection to exclude evidence of the civil suits under N.C.G.S. § 8C-1, Rule 403.[10] According to the State,

---

[9] After awarding defendant a new trial, the Court of Appeals dismissed defendant's pending motion for appropriate relief as moot. After this Court granted the State's discretionary review petition and assumed jurisdiction over this case, defendant filed a motion for appropriate relief with this Court in which he has asked us to consider his ineffective assistance of counsel claim on the merits in the event that we were to reverse the decision of the Court of Appeals. In addition, the State has also effectively requested us to consider defendant's ineffective assistance of counsel claim on the merits by addressing and deciding the issue of whether evidence related to the civil actions was admitted for an improper purpose under N.C.G.S. § 1-149 even if we find that defendant failed to properly preserve that issue for purposes of appellate review. We decline the parties' invitation to directly or indirectly address defendant's claim for ineffective assistance of counsel at this time. As we have noted elsewhere in this opinion, the effect of our decision to reverse the Court of Appeals' decision in this case is to resuscitate the motion for appropriate relief that defendant filed in that court, a development that renders it unnecessary for us to address and decide the issues that defendant has sought to raise in the essentially identical motion for appropriate relief that he has filed with this Court. Having discussed how N.C.G.S. § 1-149 should be construed in the course of deciding whether defendant had properly preserved the claim that he has advanced in reliance upon that statute for purposes of appellate review, we believe that we have given the lower courts sufficient guidance concerning the manner in which any remaining issues relating to N.C.G.S. § 1-149 should be decided. As a result, we decline to further address the merits of the claim that defendant has advanced in reliance upon N.C.G.S. § 1-149 at this time and dismiss the motion for appropriate relief that defendant has filed with this Court without prejudice to his right to pursue the similar motion for appropriate relief that will be before the Court of Appeals on remand.

[10] In his brief, defendant points out that, in addition to explicitly objecting to the admission of evidence concerning his response to the wrongful death and declaratory judgment action pursuant to N.C.G.S. § 8C-1, Rule 403, he also lodged one or more objections for which no grounds were stated at one point during Ms. Freeman's testimony. Based upon

the Court of Appeals misapplied the applicable standard of review by essentially

reweighing the factors that supported and militated against the admission of the

challenged evidence rather than determining whether the trial court's decision to

admit the challenged evidence lacked any reasoned basis.  Once again, we find the

State's argument persuasive.[11]

"Although relevant, evidence may be excluded if its probative value is

substantially outweighed by the danger of unfair prejudice, confusion of the issues,

or misleading the jury, or by considerations of undue delay, waste of time, or needless

presentation of cumulative evidence."  N.C.G.S. § 8C-1, Rule 403 (2013).  "This

determination is within the sound discretion of the trial court, and the trial court's

ruling should not be overturned on appeal unless the ruling was 'manifestly

---

that fact, defendant appears to suggest that he is entitled to challenge the admission of the evidence in question on relevance and hearsay grounds as well as on the basis of N.C.G.S. § 8C-1, Rule 403.  However, given that a "general objection, if overruled is no good, unless on the face of the evidence, there is no purpose whatever for which it could have been admissible," *State v. Ward*, 301 N.C. 469, 477, 272 S.E.2d 84, 89 (1980) (quoting 1 *Stansbury's North Carolina Evidence* § 27, at 72 (Brandis rev. 1973)), and given that the challenged evidence, as is explained in more detail below, is not inadmissible for all purposes, defendant's relevance and hearsay arguments are not properly before us.

[11] As an aside, we note that, despite the Court of Appeals' determination that the admission of evidence concerning both of the civil actions discussed in the text of this opinion violated N.C.G.S. § 8C-1, Rule 403, defendant never actually objected to admission of evidence of the child custody complaint and consent judgment on any grounds at trial.  In view of that fact, the Court of Appeals lacked the authority to consider the validity of defendant's challenge to the admission of evidence concerning the child custody proceeding under N.C.G.S. § 8C-1, Rule 403, on the merits.  As a result, the only issue that is properly before us under N.C.G.S. § 8C-1, Rule 403, is the extent to which the trial court erred by allowing the admission of evidence relating to defendant's response to the wrongful death and declaratory judgment action.

unsupported by reason or [was] so arbitrary that it could not have been the result of a reasoned decision.' " *State v. Hyde*, 352 N.C. 37, 55, 530 S.E.2d 281, 293 (2000) (alteration in original) (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)), *cert. denied*, 531 U.S. 1114, 121 S. Ct. 862, 148 L. Ed. 2d 775 (2001). Thus, the ultimate issue raised by defendant's challenge to the admission of evidence concerning his response to the wrongful death and declaratory judgment action is whether the trial court's decision to allow the admission of the challenged evidence was so arbitrary that it could not have resulted from the making of a reasoned decision.

The Court of Appeals held that the trial court abused its discretion by allowing the admission of the challenged evidence for two basic reasons. *Young*, __ N.C. App. at __, 756 S.E.2d at 783. As an initial matter, the Court of Appeals held that the substantial prejudice resulting from the introduction of this evidence "irreparably diminished" defendant's presumption of innocence and "vastly outweighed [its] probative value." *Id.* at __, 756 S.E.2d at 783. We do not find this logic convincing.

As a general proposition, appellate decisions holding that a trial court erroneously failed to sustain an objection lodged pursuant to N.C.G.S. § 8C-1, Rule 403, tend to rest on determinations that the admission of the evidence in question served little or no purpose other than to inflame the passions of the jury. *See, e.g.*, *Hennis*, 323 N.C. at 283, 286-87, 372 S.E.2d at 526, 531 (finding prejudicial error in a trial court decision to allow the admission of thirty-five gruesome photographs

depicting the decayed bodies of murder victims displayed on a screen positioned immediately over the defendant's head and distributed one at a time to the jury over the course of an hour); *State v. Kimbrell*, 320 N.C. 762, 768-69, 360 S.E.2d 691, 694-95 (1987) (holding that the trial court committed prejudicial error by admitting evidence that the defendant engaged in "devil worship" because the evidence "had little or no probative value and can only have been [used] to arouse the passion and prejudice of the jury"). For that reason, one of the ultimate questions raised by the argument that defendant has advanced in reliance upon N.C.G.S. § 8C-1, Rule 403, in challenging the trial court's decision to admit evidence concerning the complaint filed and default judgments entered in the wrongful death and declaratory judgment action is whether the evidence in question had any significant probative value or, alternatively, whether the sole effect of the challenged evidence was to unfairly prejudice the defendant in the eyes of the jury.

A careful review of the record demonstrates that the evidence relating to the wrongful death and declaratory judgment action had at least some material probative value for the purpose of challenging the validity of defendant's alibi defense. Evidence has "probative value" if it "tends to prove or disprove a point in issue." *Probative Evidence, Black's Law Dictionary* (8th ed. 2004). As a result, the extent to which evidence does or does not have probative value depends upon the extent to which a reasonable mind would be more or less influenced by the introduction of the evidence in question in determining whether a disputed fact did or did not exist.

This Court has repeatedly upheld the admission of evidence concerning a defendant's actions after the commission of a crime on the theory that such evidence was relevant to the issue of whether the defendant committed the crime in question. *See State v. McDougald*, 336 N.C. 451, 457, 444 S.E.2d 211, 215 (1994) (finding that the probative value of evidence to the effect that the defendant had escaped from jail before trial was not substantially outweighed by the danger of unfair prejudice on the grounds that the challenged evidence "tended to show the defendant's consciousness of his guilt"); *State v. Stager*, 329 N.C. 278, 321-22, 406 S.E.2d 876, 900-01 (1991) (upholding the admission of evidence to the effect that, among other things, the defendant exhibited a calm demeanor on the morning of her husband's death and that the defendant had disposed of some of her husband's personal effects the day after his funeral). In other words, there is no blanket rule prohibiting the admission of evidence concerning a defendant's conduct after the commission of a crime as long as that evidence has a tendency to shed light on the issue of whether the defendant committed the crime for which he is standing trial. As a result, in order to evaluate the validity of defendant's argument in reliance upon N.C.G.S. § 8C-1, Rule 403, we need not do any more than determine whether that evidence had probative value without being overly concerned about the temporal relationship between the events

described in the evidence in question and the date upon which the crime charged was allegedly committed.[12]

The strategy employed by the State in defendant's second trial included an attempt to demonstrate that the alibi evidence that defendant presented at the first trial was false. As part of that process, the State attempted to demonstrate that defendant had attempted to "sandbag" the prosecution by waiting until after he had heard the State's evidence before offering up his own version of what had happened, thereby gaining for himself the opportunity to provide an explanation for all of the incriminating evidence that the State had amassed against him. The admission of evidence that, at a substantial economic cost, defendant allowed the entry of a default judgment against himself in the wrongful death and declaratory judgment action rather than offering up a defense and subjecting his account of the events of 2 and 3 November 2006 to scrutiny by others, including agents of the State, in that proceeding did tend to bolster the validity of the State's attack upon the credibility of defendant's alibi. As a result, we are unable to say that the evidence concerning defendant's response to the wrongful death and declaratory judgment action that the trial court

---

[12] The extent to which evidence has probative value and the extent to which evidence may be admitted for a particular purpose are two different, albeit related, questions. As a result, even if, as defendant vigorously contends, the State intended for the jury to draw an inference that is forbidden by N.C.G.S. § 1-149 based upon the introduction of evidence concerning defendant's response to the wrongful death and declaratory judgment action, the proper manner in which to address that problem would have been for defendant to have lodged an appropriate objection and to either obtain a favorable ruling with respect to that issue or to properly preserve that issue for purposes of appellate review.

admitted at defendant's second trial had no probative value in light of the fact that the credibility of a defendant's account of what happened is always of significant interest to jurors.[13]

We recognize that the admission of evidence that defendant failed to respond to the allegations advanced against him in the wrongful death and declaratory judgment action posed a significant risk of unfair prejudice to defendant. This risk of unfair prejudice was heightened by the fact that the trial court had heard the estate's motion for the entry of a default judgment in the declaratory judgment action and found that defendant had "unlawfully" killed Ms. Young. In recognition of this risk, the trial court explicitly instructed the jury concerning the manner in which civil cases are heard and decided, the effect that a failure to respond has on the civil plaintiff's ability to obtain the requested relief, and the fact that "[t]he entry of a civil judgment is not a determination of guilt by any court that the named defendant has committed any criminal offense."[14] As a result of the fact that the jury is presumed

---

[13] The fact that the State advanced a similar argument at the first trial without attempting to introduce the challenged evidence has no bearing on the extent to which the State was entitled to take a different tack on retrial.

[14] Although the trial court did not, as defendant notes, instruct the jury that the evidence concerning the wrongful death and declaratory judgment action was admitted for the sole purpose of attacking the credibility of defendant's claim of alibi, "[t]he admission of evidence, competent for a restricted purpose, will not be held error in the absence of a request by defendant for a limiting instruction." *State v. Chandler*, 324 N.C. 172, 182, 376 S.E.2d 728, 735 (1989) (citation omitted). As a result of the fact that defendant's trial counsel never requested the trial court to instruct the jury concerning the purposes for which the jury was entitled to consider the evidence concerning the wrongful death and declaratory judgment action or objected to the instructions that the trial court, acting *ex mero motu*, decided to

to have followed the trial court's instructions, *State v. Tirado*, 358 N.C. 551, 581, 599 S.E.2d 515, 535 (2004) (citation omitted), *cert. denied*. 544 U.S. 909, 125 S. Ct. 1600, 161 L. Ed. 2d 285 (2005), the record reflects that the trial court took action that is presumed to have been effective to protect defendant against the exact harm about which he expresses concern.

Although the members of this Court might well have reached a different result from the trial court after balancing the probative value of the evidence concerning defendant's failure to respond to the wrongful death and declaratory judgment action against the risk of unfair prejudice associated with the admission of that evidence, the applicable standard of review requires us to simply determine whether the trial court could have made a reasoned decision to allow the admission of the evidence in question. *State v. Locklear*, 363 N.C. 438, 449, 681 S.E.2d 293, 302-03 (2009) (stating that, "[i]n our review, we consider not whether we might disagree" with the trial court but whether "the trial court's actions are fairly supported by the record" (quoting *State v. Whaley*, 362 N.C. 156, 160, 655 S.E.2d 388, 390 (2008))). In view of the fact that the evidence concerning defendant's response to the wrongful death and declaratory judgment action had material probative value and the fact that the trial court recognized and made a serious attempt to address the risk of unfair prejudice that would inevitably flow from the admission of that evidence, we cannot conclude

---

deliver concerning that subject, defendant is not entitled to complain that the prejudicial effect of the challenged evidence was compounded by the trial court's failure to instruct the jury concerning the purposes for which the challenged evidence could properly be considered.

that the trial court erred in determining that the risk of unfair prejudice resulting from the introduction of the challenged evidence did not substantially outweigh its probative value.

In awarding defendant a new trial, the Court of Appeals relied upon this Court's decision in *State v. Scott*, 331 N.C. 39, 43, 413 S.E.2d 787, 789 (1992), for the proposition that, "[w]hen the intrinsic nature of the evidence itself is such that its probative value is always necessarily outweighed by the danger of unfair prejudice, the evidence becomes inadmissible under [Rule 403] as a matter of law." *Young*, __ N.C. App. at __, 756 S.E.2d at 783 (second alteration in original) (quoting *Scott*, 331 N.C. at 43, 413 S.E.2d at 789). In *Scott*, this Court concluded that the admission of evidence of a prior alleged offense for which the defendant "had been tried and acquitted" in an earlier trial constituted an abuse of discretion "as a matter of law" on the grounds that the probative value of the evidence in question depended on the extent to which the defendant had actually committed the prior alleged offense and that the fact that he had been found not guilty of having committed that offense deprived the evidence in question of any probative value, 331 N.C. at 42, 413 S.E.2d at 788, on the theory that the defendant's acquittal meant that he "has been 'set free or judicially discharged from an accusation; released from . . . a charge or *suspicion* of guilt,' " *id.* at 43, 413 S.E.2d at 789 (quoting *State v. Marley*, 321 N.C. 415, 424, 364 S.E.2d 133, 138 (1988) (alterations in original)). The probative value of the evidence at issue in this case, unlike that of the evidence at issue in *Scott*, was not

undercut by the existence of a prior judicial determination that the accusation lodged against the defendant in the related matter had no merit. As a result, the Court of Appeals' reliance upon *Scott* was misplaced.

The second justification advanced by the Court of Appeals in support of its decision to hold that the trial court had abused its discretion by allowing the admission of evidence concerning defendant's response to the wrongful death and declaratory judgment action was that the trial court admitted the challenged evidence while subject to a misapprehension of law. *Young*, __ N.C. App. at __, 756 S.E.2d at 783. According to well-established North Carolina law, "[w]here a ruling is based upon a misapprehension of the applicable law, the cause will be remanded in order that the matter may be considered in its true legal light." *Nationwide Mut. Ins. Co. v. Chantos*, 298 N.C. 246, 252, 258 S.E.2d 334, 338 (1979) (citation omitted). In support of this determination, the Court of Appeals held that the trial court had an obligation, even in the absence of an objection, to conduct an inquiry for the purpose of determining whether the admission of the challenged evidence would violate N.C.G.S. § 1-149 and had failed to do so. *Young*, __ N.C. App. at __, 756 S.E.2d at 783. As we have already noted, however, N.C.G.S. § 1-149 does not require the trial court to act in the absence of an objection from one or the other party. In view of the fact that neither party to this case directed the trial court's attention to N.C.G.S. § 1-149 at the time that the challenged evidence was admitted, the trial court was not obligated to consider the potential applicability of N.C.G.S. § 1-149 at the risk of being

reversed on appeal in the absence of a showing of plain error.[15]  As a result, given that the Court of Appeals erred by holding that the trial court violated N.C.G.S. § 8C-1, Rule 403, by admitting evidence concerning defendant's response to the wrongful death and declaratory judgment action, defendant is not entitled to relief from the trial court's judgment on the basis of the admission of that evidence.

## III. Conclusion

Thus, for the reasons set forth above, we conclude that the Court of Appeals erred by awarding defendant a new trial based upon the admission of evidence concerning defendant's response to the wrongful death and declaratory judgment action and the child custody action that were filed against him by members of Ms. Young's family.[16]  As a result, the Court of Appeals' decision should be, and hereby is, reversed, and this case should be, and hereby is, remanded to the Court of Appeals for consideration of defendant's remaining challenges to the trial court's judgment, including the issues raised by the motion for appropriate relief that defendant filed before the Court of Appeals.

REVERSED AND REMANDED.

---

[15] Although defendant alludes at one point in his brief to the possibility that the admission of the challenged evidence constituted plain error, the Court of Appeals did not decide this case on plain error grounds and defendant has failed to advance any detailed "plain error"-based argument in his brief before this Court.

[16] The remaining issues addressed by the Court of Appeals are not before this Court, so the Court of Appeals' decision with respect to these issues remains undisturbed.